156 A.3d 1114

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Charles Ray HICKS, Appellant**

**No. 718 CAP**

Supreme Court of Pennsylvania.

ARGUED: September 13, 2016

DECIDED: March 28, 2017

446

448

Jason Allen LaBar, Esq., Monroe County Public Defender, for Appellant.

Elmer D. Christine Jr., Esq., Michael Mancuso, Esq., Kimberly Ann Metzger, Esq., Monroe County District Attorney's Office, Amy Zapp, Esq., for Appellee.

SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.

Justice Dougherty delivers the Opinion of the Court with respect to Parts I, II and IV and announces the judgment of the Court. Justices Todd and Mundy join the opinion in full. Chief Justice Saylor joins in Parts I, II and IV and in the judgment and files a concurring opinion. Justice Baer also files a concurrence. Justices Donohue and Wecht file dissenting opinions, and Justice Wecht joins the merits portion of Justice Donohue's dissent.

## OPINION

JUSTICE DOUGHERTY

Appellant Charles Ray Hicks appeals from the sentence of death imposed by the Monroe County Court of Common Pleas after a jury convicted him of first-degree murder, tampering with evidence, and abuse of corpse.[1] For the following reasons, we affirm the judgment of sentence.

1. 18 Pa.C.S § 2502(a), 18 Pa.C.S § 4910(1), and 18 Pa.C.S § 5510, respectively.

## I. Background

On January 29, 2008, Corporal Jody Radziewicz, a member of the forensic services unit of the Pennsylvania State Police, was called to process several crime scenes where body parts were discovered on stretches of Route 380 and Route 80 in Monroe and Lackawanna Counties. N.T. 11/5/14 at 91. At these various locations, troopers recovered numerous black garbage bags with blue handle ties containing the body parts of a woman, except for her hands. *Id.* at 91–93. Surprising to Corporal Radziewicz was the fact that most of the body parts were relatively cleanly severed, probably with a knife or saw, and free from blood. *Id.* at 102, 121. However, there was blood and a jagged cut in the shoulder area where the neck and head were severed from the rest of the body. *Id.* at 157. The victim's head was found on the on-ramp to Route 380 from Route 423 in Tobyhanna, Monroe County, about 200 yards from appellant's house. *Id.* at 83, 163.

Dr. Saralee Funk performed an autopsy at the Monroe County Coroner's Office, and a rape kit was also prepared; hairs, footprints, and other DNA evidence were taken from the victim. *Id.* at 198–201. The victim was eventually identified as Deanna Null after dental records were compared and determined to be a match. *Id.* at 206. Dr. Funk's autopsy report stated there were ambiguities around the timing of the injuries, and pre-death trauma could not be ruled out until additional testing was completed. N.T. 11/6/14 at 141–42. Shortly after the autopsy and before additional testing, Dr. Funk suffered a serious health crisis which led to her retirement. N.T. 11/5/14 at 206–07.

The autopsy report was later reviewed and additional testing was completed by Dr. Wayne Ross, a forensic pathologist working in multiple counties in Pennsylvania. N.T. 11/6/14 at 20. After observing marks and swelling on the victim's face, Dr. Ross concluded this was due to blunt force trauma from being hit in the face with a hand or fist at least six times while she was still alive. *Id.* at 28–33. Dr. Ross also found pre-death injuries, including lacerations, on the back of the victim's head which he determined were consistent with being struck with a

crowbar or a pipe. *Id.* at 34–38. Dr. Ross concluded the victim suffered at least seventeen different impacts to her face and head area while she was still alive as there was swelling and hemorrhaging which would not have occurred had the victim been deceased prior to the trauma. *Id.* at 44. Further predeath injuries were found to the victim's torso, including all twelve ribs being fractured multiple times. *Id.* at 51. Dr. Ross concluded these injuries resulted from being stomped with a boot or shoe. *Id.* at 54. Dr. Ross also found evidence the victim was strangled while alive based on the red-purple appearance of her face and hemorrhaging in the throat area. *Id.* at 61–64. Using a process called "blood staining," and based on blood and blood clotting around the neck tissue, Dr. Ross concluded the victim was alive when her neck and head were severed from her torso. *Id.* at 75–90. Dr. Ross ultimately concluded the victim's cause of death was a combination of strangulation and sharp force injury to her neck. *Id.* at 90.[2]

Anthony Bullock was interviewed by police and stated the victim had brought appellant to his home in the Scranton area on or about January 25, 2008. *Id.* at 221. After staying for a few hours, appellant and the victim left Mr. Bullock's home. *Id.* This was the last time Mr. Bullock saw the victim and stated she seemed nervous and withdrawn during the visit, which was not like her normally outgoing demeanor. *Id.* at 224. Mr. Bullock stated appellant returned a few hours later looking for crack cocaine without the victim. *Id.* at 222.

Joseph McCallister was also interviewed and told police he had introduced the victim to a man who was looking for prostitutes and drugs in the Scranton area in January of 2008. *Id.* at 173–76. McCallister gave the police a description of the man and his vehicle and also told police the man stated he worked in Tobyhanna. *Id.* at 178.

On February 7, 2008, Trooper Kent Lane was on surveillance looking for a dark colored sedan with a vinyl roof as

2. Justice Donohue, in dissent, notes there was conflicting expert testimony regarding the manner of the victim's death and whether her neck injuries were pre- or postmortem. Dissenting Opinion, Donohue J., at 510–11, n.11, 156 A.3d at 1153–54, n.11.

described by McCallister. *Id.* at 148. While traveling on Route 423, near the intersection of Route 380, Trooper Lane observed a dark blue Mercury Grand Marquis parked at 131 Prospect Street, appellant's residence. *Id.* at 149. After searching the license plate number, Trooper Lane determined the owner of the vehicle was a "Charles R. Hicks," but the investigation regarding appellant was placed on hold while other leads were followed. N.T. 11/10/14 at 120. However, on March 4, 2008, Trooper Shawn Hilbert received information about the same vehicle being present at appellant's residence. N.T. 11/6/14 at 153. After further confirming Charles Hicks of Burleson, Texas was the owner of the vehicle, Trooper Hilbert called the Texas Intelligence Department which provided driver's license photographs for two men named Charles Hicks, father and son, who resided at the same address in Burleson. *Id.* at 156–57.

Police secured a search warrant for the vehicle and approached appellant in a parking lot after following his vehicle. N.T. 11/10/14 at 126. Appellant agreed to go to the police barracks for an interview. *Id.* During the interview, appellant acknowledged he knew the victim as a prostitute from Scranton and had been with her on one or two occasions in the beginning of January 2008. *Id.* at 132. Appellant also stated he was addicted to crack cocaine and had some problems with alcohol. *Id.* at 133. However, appellant denied ever becoming violent with the victim. *Id.* at 146. During the search of the vehicle, police recovered a blood-stained pair of boots from the trunk. *Id.* at 21–23, 63–64. There were also traces of blood present in the front passenger seat. *Id.* at 24. When asked about the blood on the boots, appellant stated he did not know how it got there. *Id.* at 156. Appellant was then informed a search warrant had been secured for his home. *Id.* at 157.

Trooper Matthew Johnstone, a New York State Police dog handler, was called in to assist the Pennsylvania State Police in their search of appellant's residence and vehicle for human remains. N.T. 11/7/14 at 18–19. After there was no alert to such remains in the vehicle or the exterior of appellant's property, Trooper Johnstone moved inside the house. *Id.* at

19. The K9 alerted to a briefcase in the living room area and the floor in one corner of the basement. *Id.* at 20–21. The briefcase contained a very detailed handwritten map of the Scranton area. N.T. 11/10/14 at 172–73. Collected from the basement was a Sawzall reciprocating saw blade and medium length brown hairs. N.T. 11/7/14 at 196. Medium length hairs and skin particles were also recovered from various items, including a scrub brush, found inside a tool bag recovered from another part of the house. N.T. 11/10/14 at 43–52. The DNA profile taken from the hairs on the scrub brush were determined to match the DNA profile of the victim. *Id.* at 89. Five unused black garbage bags with blue draw strings, which were identical to the bags containing the victim's body parts, were found in the attic of the house. N.T. 11/7/14 at 143. Fingerprints found on the garbage bags from the attic matched those of appellant. N.T. 11/10/14 at 36. The search of the home also produced a pair of human hands wrapped in socks, newspaper pages dated February 4, 2008, and Ziplock bags; the hands were found inside a large access panel for the bathroom plumbing. N.T. 11/7/14 at 162–168. Socks found in appellant's bedroom and unused Ziplock bags found in the kitchen were exact matches with those used to wrap the hands. *Id.* at 185–189. The fingerprints from the recovered hands matched those of the victim. N.T. 11/10/14 at 37. Appellant was taken into custody and charged with the murder of Deanna Null. *Id.* at 161.

Prior to trial, the Commonwealth filed a notice pursuant to Pennsylvania Rule of Evidence 404(b)(3) informing appellant of its intention to introduce evidence of prior bad acts through the testimony of eight women with whom appellant had a sexual and/or prostitution-type relationship, which also involved the use of illegal narcotics such as crack cocaine. Commonwealth's Pa.R.E. 404(b) Notice, 3/26/10 at 1.[3] The

3. Rule 404(b)(1) provides "evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, subsection (2) of the rule provides such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, ab-

Commonwealth sought to introduce the evidence in order to buttress circumstantial evidence in the case by showing motive, identity and intent, as well as to rebut any defense based on accidental death. *Id.* at 1–2. The proposed witnesses—identified as Cheryl Denise Phillips, Lakessia Roshe Mayfield, Suzanne Downing, Lakisha Muhammad a/k/a Lakisha Washington, Karen Lovell, Misty Kay Chavez, Sheinina Hicks, and Kim Alston—would testify to appellant's alleged assaults on them which included beating, choking, and threats with edged weapons. *Id.* The Commonwealth posited the proposed testimony would demonstrate a common scheme on the part of appellant to victimize prostitutes, or women engaging in prostitution to satisfy their addictions to controlled substances, such as the victim in the present case. *Id.* at 1–2.

Appellant filed a motion to exclude Rule 404(b) testimony and, in response, the trial court ordered the Commonwealth to file an offer of proof for each witness. The Commonwealth filed offers of proof for seven of the eight witnesses,[4] alleging their experiences with appellant bore striking similarities to the victim's murder for the following reasons: all were women who had engaged in prostitution and drug use with appellant, who had admitted to having sex and using drugs with the victim; the witnesses were assaulted primarily by being beaten or choked with appellant's hands, and the blunt force trauma suffered by the victim was consistent with this type of assault; several of the witnesses were threatened with edged weapons, and the victim suffered numerous injuries by edged weapons; disputes arising out of a sexual encounter appeared to be the motive for many of the assaults, and appellant admitted having a sexual relationship with the victim. Commonwealth's Pa.R.E. 404(b) Offers of Proof, 4/27/11 at 6. The Commonwealth also argued the probative value of the evidence outweighed any unfairly prejudicial effect as its case

sence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

4. The Commonwealth did not provide an offer of proof with respect to Lakessia Roshe Mayfield.

against appellant was based primarily on circumstantial evidence. *Id.* at 7.

After subsequent briefing by the parties, the trial court determined the testimony of Alston, Lovell and Chavez was admissible pursuant to Rule 404(b), while the testimony of Phillips, Washington, Hicks and Downing was inadmissible as cumulative, and its prejudicial effect would outweigh its probative value. Tr. Ct. Opinion, 7/14/11 at 15. The Commonwealth filed an interlocutory appeal and appellant cross-appealed. The trial court's ruling was affirmed by the Superior Court, and the Commonwealth petitioned this Court for allowance of appeal. This Court accepted review and ultimately reversed the Superior Court's decision, remanding to the trial court for further proceedings regarding the admissibility of testimony from the excluded witnesses Phillips, Washington, Hicks and Downing. *Commonwealth v. Hicks,* 625 Pa. 90, 91 A.3d 47 (2014). The Court held the trial court should have deferred balancing probative value against prejudicial effect until trial, and stated, "the [trial] court erred in ruling which witnesses would be the cumulative ones, restricting which ones the prosecution might call." *Id.* at 55.

On remand, the trial court held the testimony of Phillips, Washington and Hicks was admissible, while again ruling the testimony of Downing was inadmissible. The Commonwealth ultimately presented the testimony of Alston, Chavez and Washington at trial. Twice during trial and with significant detail while charging the jury at the close of the guilt phase, the trial court instructed the jury the witnesses' testimony was not offered to show appellant's bad character, but for the "very limited purpose" of proving intent, motive, common plan or scheme and lack of accident. N.T. 11/7/14 at 59–60, 88; N.T. 11/14/14 at 110–12.[5]

5. Specifically, while charging the jury after the guilt phase, the trial court stated:

Allowed into evidence was certain testimony regarding alleged instances between Mr. Hicks and other women occurring prior to these alleged offenses and the offense for which he is on trial currently. The testimony I'm referring to was from Ms. Alston, Ms. Kim Alston, Ms. Lakisha Washington, and Ms. Misty Chavez. That evidence is before you for a

Alston, a recovering drug addict, testified she was living in

very limited purpose, and that is to prove an absence of accident or mistake on this occasion and as evidence of intent, motive, and ill will towards the victim in this case, Deanna Null. Evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible for other purposes including showing an absence of accident. Evidence of other crimes, wrongs, or acts may be admissible to prove motive, intent, and absence of accident. In other words, if it is believed by you, the evidence concerning circumstances of these other instances may only be used to infer that Ms. Null's death was not accidental. Also, if you choose to consider, you may consider the evidence when finding what the state of mind was during the course of events involving the victim in this case. That's the intent part. Intent is a mental state that can be inferred from conduct. Evidence of prior occurrences and prior offenses, if they are related to the offense for which the Defendant is on trial, may be admitted to show intent. So it's a very narrow and limited purpose for which that evidence is admitted. This evidence may not be considered by you in any other way other than for the purposes I just stated. You must not regard this evidence as showing that the Defendant is a person of bad character or criminal propensity from which you might infer guilt in this case.

N.T. 11/14/14 at 10–12. In addition, during trial, the court instructed the jury as follows:

So the evidence that comes in from both Ms. Washington and Ms. Alston—the evidence that you heard yesterday and that you may hear today is being offered for a particular purpose, and you could only consider it for a particular purpose, and it's very limited, and that would be because it is evidence which if believed by you—again, you're judging credibility like you would any other witness—but if believed by you would show that certain things happened unrelated to this case but at some earlier point in time. And it's offered only and can be used only to prove an absence of accident or mistake on this occasion in this case and as evidence of Mr. Hicks' intent and motive, okay.

In other words, if the evidence is believed by you, the evidence concerning the circumstances of these other incidents on prior occasions may only be used to infer that Ms. Null's death was not accidental, not that it was committed by Mr. Hicks. As well as that, you can consider this evidence with respect to intent.

So, that is, what was the state of mind during the course of events involving the victim in this case, Ms. Null? It can't be considered by you in any other way. And, that is, you may not and must not use this evidence to infer that Mr. Hicks is a person of bad character or criminal propensity from which you might infer guilt.

N.T. 11/7/14 at 59–60. And, later, the court further stated:

Again, this is the same caution to the jurors and the same instruction I gave you as to Ms. Alston and Ms. Washington, that this witness' testimony, if believed by you, is offered not to show and may not be regarded as evidence of Mr. Hick's bad character or criminal tendencies but solely to prove motive, common plan or scheme, lack of accident, and as to this particular witness identity of the perpetrator of this particular crime that we're here in trial for, okay.

*Id.* at 88.

Virginia in 2006 when she relapsed on marijuana and cocaine. N.T. 11/6/14 at 186–87. During her relapse, she was brought to appellant's home by a woman named Yvette. *Id.* at 187. Alston provided appellant with approximately $200 worth of crack cocaine. *Id.* at 192. After Yvette departed, appellant and Alston argued over money for the drugs. *Id.* As Alston observed appellant become very angry, she ended the argument and attempted to leave the house. *Id.* at 192–93. Appellant displayed a gun and verbally threatened to kill Alston, while Alston again attempted to leave and refused to give appellant more drugs. *Id.* at 193, 195. Appellant then grabbed Alston by the throat and choked her until she was unconscious. *Id.* at 196. When Alston regained consciousness, appellant was sitting on top of her, both of them were naked, and appellant had a knife to her throat while attempting to penetrate her sexually. *Id.* at 196, 199. When appellant allowed Alston to leave the house, he refused to give her her clothes; Alston ran out of the house naked, a neighbor gave her clothes, and she called the police. *Id.* at 198. Charges filed against appellant were eventually dismissed when Alston failed to appear for court. *Id.* at 207. Alston testified this was the first and last time she ever saw appellant, and she has been in recovery from drug use ever since. *Id.* at 200.

Washington testified she was living in Fort Worth, Texas in 2003 when she first used crack cocaine. N.T. 11/7/14 at 62. At this time, Washington was a prostitute and would offer sex for drugs or money. *Id.* at 81. One evening, Washington went to a known drug area and entered a car with a man named Ronnie Hogan. *Id.* Washington and Hogan went to the Relax Inn and partied all night with appellant. *Id.* The next morning appellant and Hogan left the hotel to get Hogan's car fixed. *Id.* at 62–63. Appellant then returned to the hotel without Hogan and agreed to take Washington to get heroin. *Id.* at 64. Washington testified that, after using the heroin, she was in and out of consciousness all day, until she woke up in appellant's truck parked on a dark property. *Id.* at 63–65. As Washington and appellant smoked crack in the truck, appellant asked her to touch her vagina. *Id.* at 66. Washington

stated she complied with the request because "it's like an unwritten rule that if you give me the drugs ... I give you the sex." *Id.* When appellant began driving back to the highway, the two argued about directions. *Id.* at 67. As Washington attempted to exit the vehicle, appellant angrily grabbed her by the neck and pulled her back inside. *Id.* Appellant calmed down and allowed Washington to drive back to the Relax Inn, but then told her if she left the vehicle he would kill her. *Id.* at 68. Notwithstanding appellant's threat, Washington left the vehicle and attracted the attention of the hotel manager, who called police. *Id.* Washington testified this was the only time she ever saw appellant. *Id.* at 69.

Chavez testified she was living in Arlington, Texas in the 2002–2003 time period when she met appellant. *Id.* at 90. Chavez was unemployed and supporting her cocaine addiction through prostitution. *Id.* at 92. Chavez testified she was introduced to appellant by her girlfriend and used drugs with him a couple times a week, but their encounters did not always involve sex. *Id.* at 92–93. After several months of this relationship, appellant and Chavez had an argument while driving on Highway 360 about where she was buying drugs. *Id.* at 93. Chavez said to appellant, "I'm not the bitch that you can control." *Id.* Appellant became angry and reached over the center console, choking Chavez until she felt she would black out, cutting her skin with his fingernails in the process. *Id.* at 94, 97. Chavez opened the vehicle door to escape, but closed it after appellant told her to "Shut the door, or I'll kill you." *Id.* Appellant exited the highway, pulled the car over and said he was sorry; the two returned to his apartment. *Id.* at 95–96. When Chavez attempted to leave the apartment in her own vehicle, appellant pleaded with her to stay and let him clean the blood off her neck. *Id.* at 97–98. Appellant said, "Misty, I'm sick. I've done this before. That's why I can't keep relationships. Something's wrong with me." *Id.* at 98. Chavez stopped seeing appellant after this incident. *Id.* at 100. Finally, Chavez testified she received a call from appellant about a year later during which he said "I hurt her. Misty, I hurt her."

*Id.* at 101. Chavez stated she could hear a female screaming in the background during the phone call. *Id.*

Appellant presented the testimony of Dr. John J. Shane, who had extensive experience in forensic pathology but was not board certified. N.T. 11/12/14 at 11. Dr. Shane testified he reviewed Dr. Funke's autopsy report and concluded the victim's bruising and lacerations occurred after her death. *Id.* at 15–33. Dr. Shane also concluded the victim's cause of death was most likely related to substance abuse and accidental. *Id.* at 37. At the conclusion of the guilt phase, the jury convicted appellant of first-degree murder, tampering with evidence, and abuse of corpse.

The Commonwealth moved to introduce all guilt phase evidence into the record for the penalty phase, and the trial court granted the motion with no objection from appellant. N.T. 11/17/14 at 16. The Commonwealth asked the jury to find the torture aggravator, 42 Pa.C.S. § 9711(d)(8), and stipulated to the mitigator of no significant criminal history, 42 Pa.C.S. § 9711(e)(1). *Id.* at 6. Appellant introduced testimony from his family which focused on their family's history of substance abuse and mental illness, as well as appellant's depression and attempts at suicide. *Id.* at 46–47, 57. Appellant also presented the testimony of Dr. Kenneth J. Weiss, a psychiatrist, who interviewed appellant and reviewed his medical history. Dr. Weiss concluded appellant's depression was caused by a number of adverse childhood experiences, and his drug use exacerbated his depression and fueled his violent behavior. *Id.* at 89–92. Appellant also presented testimony from several witnesses who interacted with him during his incarceration and testified he is a respected model prisoner with no disciplinary problems. N.T. 11/18/14 at 8, 10, 15 43–45. Finally, appellant introduced the testimony of Dr. Carol Armstrong, a neuropsychologist, who performed various tests and concluded appellant has many cognitive impairments which would not occur in a typical healthy individual and would affect his ability to make good judgments. *Id.* at 20–27. The jury ultimately sentenced appellant to death, finding the aggravating factor of torture outweighed any mitigating factors.

Appellant filed post-sentence motions raising claims related to the sufficiency and weight of the evidence, ineffectiveness of trial counsel, and challenging the trial court's admission of the testimony of Alston, Washington and Chavez relating to his alleged prior bad acts.[6] In explaining why it allowed the witnesses' testimony, the court relied in part on *Commonwealth v. Weakley*, 972 A.2d 1182 (Pa. Super. 2009), to analyze the similarities between Deanna Null's murder and the prior acts across several factors. *See id.* at 1189 (court must consider: "(1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims.").

The trial court found significant similarities among the incidents: each involved appellant attacking a woman in the neck area as an immediate reaction to her not behaving in the way he desired. Tr. Ct. Opinion, 8/18/15 at 30–31. The court further noted the same weapon was used in attacking each victim around the neck, *i.e.*, appellant's own hands. *Id.* at 31. The court also found the ostensible purpose of each crime was identical—appellant always attacked as an expression of control. *Id.* The court acknowledged the location factor did not support admissibility as the acts occurred in different places, but the type of victim was consistent; the court noted Deanna Null and the witnesses were of similar body types and all were drug users, appellant demonstrated a sexual interest in each woman, and the attacks occurred while appellant was alone with them. *Id.* The court concluded the prior incidents were sufficiently similar to the charged crime to be admissible. *Id.* The court further opined that, with regard to showing common plan or scheme, proof of one incident "tends to prove the others," *id.* at 32, and the jury was correctly told the evidence could be used to establish intent, motive, common plan or scheme, and lack of accident, as well as the identity of the perpetrator. *Id.* at 31–32. The court concluded the details of the various other acts were not "simply insignificant details

6. Appellant's counsel also filed a motion to withdraw and to appoint new counsel to litigate appellant's collateral claims. The only issue raised by appellant on direct appeal in this Court is his challenge to the trial court's admission of the Rule 404(b) other acts evidence.

that would likely be common no matter who perpetrated the crime," reiterating the victim and the witnesses were involved in crack cocaine use, appellant had a sexual relationship with the victim and showed a sexual interest in the witnesses, possible causes of the victim's death included asphyxiation or decapitation, and appellant violently attacked all of the witnesses in their neck area. *Id.* at 32–33. The court denied post-sentence relief and this direct appeal followed.

## II. Sufficiency of the Evidence for First–Degree Murder

 Appellant does not challenge the sufficiency of the evidence and did not brief the issue, but in all capital direct appeals, this Court conducts an independent review of the sufficiency of the evidence supporting a first-degree murder conviction, even if the defendant does not raise the claim. *See Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n.3 (1982) (to fulfill review obligation imposed by 42 Pa.C.S. § 9711(h), Court shall review sufficiency of evidence supporting first-degree murder, even where appellant does not contest sufficiency). The standard of review for evidentiary sufficiency is whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt. *Commonwealth v. Watkins*, 577 Pa. 194, 843 A.2d 1203, 1211 (2003). The Commonwealth may sustain this burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence. *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1032–33 (2007). "To obtain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed, that the defendant was the killer, and that the defendant acted with malice and a specific intent to kill." *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 624–25 (2010), *citing* 18 Pa.C.S. § 2502(a). Specific intent and malice may be inferred through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body. *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133–34 (2011).

When viewing the evidence in the light most favorable to the Commonwealth, the record establishes the victim, with whom appellant used drugs and engaged in sex, was badly beaten, strangled and decapitated with a saw blade or knife prior to her death. Furthermore, appellant had a history of violent conduct toward drug-addicted women who may have been prostitutes or with whom he otherwise had a sexual relationship. Also, appellant was the last person seen with the victim before her disappearance, blood was found in his car and on his boots, the victim's hands were found in the walls of his house and other materials found in the house matched the materials used to discard the victim's body. Although there was conflicting expert testimony regarding the circumstances of the victim's death and whether her wounds were pre- or post-mortem, the jury was free to believe the testimony of the Commonwealth witnesses and disbelieve the testimony of the defense witnesses. The jury's verdict that appellant unlawfully killed the victim with malice and the specific intent to kill was supported by the evidence of record and we will not disturb that finding.

## III. Evidence of of Rule 404(b) Crimes, Wrongs or Other Acts

 In his only briefed issue on appeal, appellant argues the trial court abused its discretion in admitting evidence of criminal allegations by the witnesses. Appellant claims the trial court erred in its analysis of the above mentioned *Weakley* factors because the only similarities between the prior incidents and the victim's death was that appellant allegedly used his hands on or around the neck area of all the women. Appellant argues there were significant differences between the encounters, including: his reasons for arguing with the women; the location of the incidents and his relationship to the witnesses and the victim (one was his girlfriend while the others were acquaintances). Appellant further argues the level of violence in the "other acts" evidence is clearly distinguishable from the level of violence perpetrated on the victim. Appellant insists the dissimilarities far outweigh their similari-

ties such that the other acts testimony was prejudicial and irrelevant.

The Commonwealth maintains the Rule 404(b) evidence was properly admitted for the legitimate purpose of proving appellant's common scheme, his identity, and the lack of accident. The Commonwealth argues the trial court, after analyzing the Weakley factors, correctly found significant similarities between the crimes committed against the witnesses and the murder of the victim, including the fact the witnesses were attacked in the neck area and the victim was strangled and decapitated. Commonwealth's Brief at 10–12, *citing Weakley*, 972 A.2d at 1189. According to the Commonwealth, the probative value of the other acts evidence far outweighed any unfairly prejudicial effect as the case against appellant was mainly circumstantial; there were no witnesses to the crime, no confession from appellant, and the victim's body was badly decomposed. Furthermore, the Commonwealth notes the defense introduced expert testimony suggesting the victim died of a drug overdose, and the other acts evidence effectively countered the suggestion of accidental death. The Commonwealth asserts the evidence was necessary to support its circumstantial case and rebut the defense's theory, as well as to prove a common plan or scheme, motive and identity.

■■■■■ "Evidence is admissible if it is relevant—that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact—and its probative value outweighs the likelihood of unfair prejudice." *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 88 (2004) (citations omitted). Admissibility of evidence is within the sound discretion of the trial court and we will not disturb an evidentiary ruling absent an abuse of that discretion. *Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831, 842 (2014), *citing Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010). Moreover, "evidence of prior bad acts, while generally not admissible to prove bad character or criminal propensity, is admissible when proffered for some other relevant purpose so long as the probative value outweighs the prejudicial effect." *Boczkowski*, 846 A.2d at 88.

See also *Arrington*, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(1); *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715, 720 (1981) (law does not allow use of evidence which tends solely to prove accused has "criminal disposition"). Such evidence may be admitted to show motive, identity, lack of accident or common plan or scheme. *Arrington*, 86 A.3d at 842, *citing* Pa.R.E. 404(b)(2); *Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 337 (2011) (Rule 404(b)(2) permits other acts evidence to prove motive, lack of accident, common plan or scheme and identity). In order for other crimes evidence to be admissible, its probative value must outweigh its potential for unfair prejudice against the defendant, Pa.R.E. 404(b)(2), and a comparison of the crimes proffered must show a logical connection between them and the crime currently charged. *Arrington*, 86 A.3d at 842.

This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime. As early as 1872, in *Shaffner v. Commonwealth*, 72 Pa. 60 (1872), the Court described the importance of such a connection as follows:

> It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. ... To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.

*Id.* at 65. *See also Commonwealth v. Wable*, 382 Pa. 80, 114 A.2d 334, 336–37 (1955) (there must be "such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other"); *Commonwealth v. Chalfa*, 313 Pa. 175, 169 A. 564, 565

(1933) (other bad acts evidence "must show some logical connection between the offenses"). "Sufficient commonality of factors" between the other incidents and the underlying crime "dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator." *Weakley*, 972 A.2d at 1189.

In further explaining the logical connection standard, this Court has noted " 'much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature.' " *Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557, 560–61 (1994) (crimes containing uniquely similar attributes constitute a signature), *quoting* McCormick on Evidence, § 190 at 449 (2d Ed. 1972) (emphasis omitted). *See also Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1282 (1989) (similarities in crimes not confined to insignificant details represent a signature); *Weakley*, 972 A.2d at 1189 (identity of perpetrator in underlying crime may be proved through other acts where they "share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant").

This Court has consistently held there was no abuse of discretion in allowing other crimes evidence in circumstances substantially similar to those presented here. *See, e.g., Commonwealth v. Elliott*, 549 Pa. 132, 700 A.2d 1243, 1250 (1997) (logical connection found where three women in their twenties were choked, beaten or both in early morning hours while alone with defendant), *abrogated on other grounds by Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003); *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1318 (1995) (logical connection found where defendant lured women of similar appearance into his car, took them to remote areas to rape and beat them in a similar manner), *abrogated on other grounds by Commonwealth v. Hanible*, 575 Pa. 255, 836 A.2d 36 (2003); *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335, 1341 (1995) (logical connection found where victims were

physically similar, attacks were of similar nature, and body of victim was found close to where defendant left other assault victims); *Rush*, 646 A.2d at 561 (logical connection found where rape victims were young black women, had undergarments pulled from them and were attacked and restrained with knives); *Hughes*, 555 A.2d at 1282–83 (logical connection found between two rapes where both victims were sexually immature, were taken off the street, were alone with defendant, and were choked). *But see Commonwealth v. Fortune*, 464 Pa. 367, 346 A.2d 783, 787 (1975) (no logical connection where there is nothing distinctive to separate other acts from common street crimes).

Most recently, this Court applied the logical connection standard in *Arrington, supra.* Tondra Dennis dated defendant Arrington for a few years, but eventually had him arrested for a series of physically and emotionally abusive incidents including beatings, death threats and break-ins. *Arrington*, 86 A.3d at 837–38. Arrington was incarcerated for a period of time, but was released after Dennis recanted her allegations. *Id.* at 838. Ten days after Arrington's release, Dennis was found murdered just 357 feet from the residence Arrington previously shared with his mother. *Id.* at 839.

As there was no physical evidence linking Arrington to the murder and the case was largely circumstantial, the Commonwealth was permitted to introduce evidence of other acts involving three of Arrington's girlfriends, their families and their friends, as well as prior crimes against Dennis herself. *Id.* at 839. The following evidence was presented at Arrington's trial. Arrington dated Victoria Dexter for some time and began to follow and telephone her continuously as the relationship progressed. *Id.* at 843. When Dexter attempted to end the relationship, Arrington threatened her, set fire to her apartment, slashed her furniture, beat her and hit her brother with a baseball bat. *Id.* Arrington was incarcerated after pleading guilty to numerous crimes, but once paroled, he began dating Sandra Williams, whom he assaulted three times during their two-year relationship. *Id.* Arrington also pistol-whipped Williams after seeing her with a male friend and

struck another male friend of Williams in the shoulder with an axe before firing a gun at him. *Id.* Arrington was again incarcerated, and began dating Dennis soon after his release; after Dennis's death, Arrington began dating Tanesha Jacobs. *Id.* Arrington punched Jacobs in the face for smiling at a group of men on a local beach and Jacobs ended the relationship; Arrington then began stalking her and threatening to kill her and her family until she left the country to live with her mother. *Id.* at 844. Arrington continued his threats via telephone, threatening to kill Jacobs's brother, who later died, and when Jacobs returned to the United States for her brother's funeral, Arrington's stalking resumed. *Id.* Shortly thereafter, Arrington was arrested and charged with Dennis's murder. *Id.* at 839.

Upon being found guilty of first-degree murder and sentenced to death, Arrington challenged the admissibility of the other acts on direct appeal to this Court. *Id.* at 837, 841. The Court held the shared characteristics of Arrington's conduct during his other relationships proved a logical connection between his prior bad acts and the underlying charged crime of Dennis's murder:

> [The] evidence was not introduced in order to "portray him as a habitual criminal with a propensity for violent behavior." Rather, it was offered to establish that [Arrington] acted pursuant to a common plan or scheme. The testimony concerning [Arrington's] treatment of other girlfriends demonstrated repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon. In each instance, [Arrington]: (1) monitored his girlfriend's daily activities; (2) resorted to violence when his partner wanted to end a relationship or interacted with other men; (3) inflicted head or neck injuries with his fist, a handgun, or an edged weapon; and (4) harmed or threatened to harm members of his girlfriend's family or male acquaintances that he viewed as romantic rivals. Given the shared characteristics of each relationship, the evidence fell within the purview of Pa.R.E. 404(b)(2).

*Id.* at 844 (citations omitted). The Court further concluded the evidence was relevant, reliable, and probative of guilt, and "strengthened the prosecution's case, which consisted entirely of circumstantial evidence. ..." *Id.* at 844–45. The Court also relied on the fact that the trial court provided the jury with "comprehensive limiting instructions." *Id.* at 845.

Like the evidence allowed in Arrington, the evidence about appellant's prior relationships with and assaults upon Alston, Washington and Chavez showed they were strikingly similar to the circumstances surrounding his relationship with the victim, her injuries, and her subsequent death, such that there was a logical connection between them. In each case appellant: (1) was introduced to drug-dependent women of similar body types for purposes of using drugs; (2) showed a sexual interest in the women, sometimes involving prostitution; (3) resorted to violence when the women behaved in a way he found disagreeable; (4) inflicted injuries on each woman by targeting her neck area with his hands, a sharp edged object, or both; and (5) verbally threatened to kill each woman.[7]

These similarities not only establish the required logical connection between the prior assaults and the circumstances surrounding the victim's death, they also present a "virtual signature" for purposes of proving common scheme, intent and identity. They are not mere insignificant details of crimes of the same class, where there is nothing distinctive to separate them from, for example, common street crimes. *Compare Hughes*, 555 A.2d at 1283 (logical connection where similarities are not confined to insignificant details but rather represent a signature) *with Fortune*, 346 A.2d at 787 (no logical connection where there is nothing distinctive to separate other acts from common street crimes). *See also Weakley*, 972 A.2d at 1189 (sufficient commonality of factors between crimes dispels notion they are merely coincidental and permits conclusion they

7. We rely on the trial court's observation that the witnesses and victim had similar body types. Tr. Ct. Opinion, 8/18/15 at 31 ("The victim and the three witnesses were all of a similar body type."). Our reliance is not misplaced. *Cf. Commonwealth v. McCracken*, 540 Pa. 541, 659 A.2d 541, 551 (1995) (trial court's findings based on observation of witnesses are entitled to deference on appeal).

are so logically connected as to share a perpetrator). There was substantial evidence presented that Deanna Null engaged in sex and drug use with appellant, was beaten, strangled, and had her throat cut by a sharp-edge weapon, ultimately resulting in her beheading and death. As in *Arrington*, the only material difference between the prior assaults and the underlying charged crime is that appellant's typically violent behavior finally progressed to a fatal attack. However, this difference does not undermine the analysis leading to admissibility of the evidence regarding the prior incidents. *See Arrington*, 86 A.3d at 844–45. *See also Hughes*, 555 A.2d at 1283, *citing Commonwealth v. Clayton*, 506 Pa. 24, 483 A.2d 1345 (1984) (other acts evidence involving prior choking victim who was injured but not killed admissible to show defendant killed second choking victim); *Weakley*, 972 A.2d at 1190 (one difference between the crimes at issue which fails to undo identity analysis is that other crime did not culminate in murder).[8]

Where a logical connection between the other crimes and the underlying charged crime has been established, as it was here, the court must also determine whether the probative value of the evidence outweighs any unfair prejudice. *See* Pa.R.E. 404(b)(2) (crimes, wrongs or other acts evidence admissible only when its probative value outweighs its potential for unfair prejudice); *Morris*, 425 A.2d at 720 (other acts evidence admissible when probative worth outweighs tendency to unfairly prejudice jury). Obviously, the impact of introducing evidence of other crimes is significant and may be highly prejudicial. *Fortune*, 346 A.2d at 787. However, such evidence is also highly probative when the Commonwealth's case is otherwise based largely on circumstantial evidence.

**8.** Justice Donohue declares the prior bad acts evidence presented here was "not even of the same class as the charged crime," and insists appellant's violent, neck-focused assaults on a series of women are wildly different from the underlying murder because he did not also kill and dismember his earlier victims. Dissenting Opinion, Donohue J., at 510, 156 A.3d at 1153 (internal quotation marks omitted). We recognize there would be an even stronger correlation between the other acts and the victim's death had appellant's violence escalated to the murder of one or more of the witnesses, but our most recent case law is clear such a perfect match is not required. *Arrington*, 86 A.3d at 844–45. *See also Weakley*, 972 A.2d at 1190.

*See Arrington*, 86 A.3d at 844–45 (prior crimes evidence plays important role where prosecution is based on circumstantial evidence); *Miller*, 664 A.2d at 1319 (other acts evidence necessary when Commonwealth only had circumstantial evidence); *Weakley*, 972 A.2d at 1191 (where prosecution's case is largely circumstantial specific purpose of other crimes evidence is "to give jury the insight into the significance of these circumstances"). Although the Commonwealth presented evidence the victim's hands were found behind the walls in appellant's home, this circumstantial evidence alone did not establish the victim's death was not an accidental overdose (as suggested by the defense), and that appellant did not, for example, merely dispose of her body afterwards. For this reason, evidence regarding appellant's assaults on Alston, Washington and Chavez was relevant and probative to show lack of accident, and that appellant acted intentionally in all instances with a common scheme: violently attacking a woman with whom he engaged in drug use and sex, in the neck, after a disagreement. Moreover, as in *Arrington*, the trial court's detailed instructions properly informed the jury of the limited and narrow purpose for which the evidence was admitted and thus restricted any unfair prejudicial effect. *See* N.T. 11/7/14 at 59–60, 88; N.T. 11/14/14 at 110–112; *Arrington*, 86 A.3d at 845 (comprehensive limiting instructions to be considered when balancing probative value and prejudicial impact); *Boczkowski*, 846 A.2d at 89 (limiting instructions weigh in favor of upholding admission of other bad acts evidence).

Accordingly, we hold the trial court did not abuse its discretion in admitting Rule 404(b) evidence regarding other crimes, wrongs or acts by appellant. The witnesses' testimony about their encounters with appellant shared such strikingly similar circumstances and characteristics with the evidence surrounding the victim's death that it tended to establish the elements of first-degree murder instead of accidental death, and also that appellant was the perpetrator. Furthermore, the probative value of the evidence to the Commonwealth's largely circumstantial case clearly outweighed any unfair prejudicial effect, which was properly limited by the trial court's caution-

ary instructions to the jury. Appellant's claim the evidence should not have been admitted therefore fails.

## IV. Statutory Review of Death Penalty Verdict

As we have determined there was sufficient evidence to sustain appellant's conviction for first degree murder, and his claim regarding Rule 404(b) evidence does not warrant relief, we now determine whether the death sentence was the product of passion, prejudice, or any other arbitrary factor, or the evidence does not support the finding of at least one aggravating circumstance. *See Arrington*, 86 A.3d at 857, *citing* 42 Pa.C.S. § 9711(h)(3). Our careful review of the record reveals the sentence was not the product of passion, prejudice, or any other arbitrary factor. To the contrary, the sentence was based on properly admitted evidence showing appellant intentionally killed the victim by cutting her throat with a knife. We further conclude the evidence was sufficient to support the aggravating circumstance of killing by means of torture as the Commonwealth expert witnesses testified the victim was severely beaten and strangled before being decapitated while she was still alive. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

The Prothonotary of this Court is directed to transmit the complete record of this case to the Governor of Pennsylvania in accordance with 42 Pa.C.S. § 9711(i).

Justices Todd and Mundy join the opinion.

Chief Justice Saylor joins Parts I, II and IV of the opinion and files a concurring opinion.

Justice Baer files a concurring opinion.

Justice Donohue files a dissenting opinion.

Justice Wecht files a dissenting opinion.

CHIEF JUSTICE SAYLOR, Concurring

I join Parts I, II and IV of the majority opinion and concur in the result relative to the balance.

As to Part III, I agree with Justice Donohue that various majority opinions of this Court, like the decisions of a number of other courts, have incorrectly blended various distinct grounds for relevance associated with proffered, uncharged misconduct. See Dissenting Opinion at 498, 156 A.3d at 1146 (Donohue, J.) (describing a "decades-long misunderstanding about what type of connection is truly required for the purpose of proving a common scheme").[1] As Justice Donohue also ably explains, either as a consequence or in conjunction, majority opinions of this Court also have substantially diluted the putatively stringent standard associated with at least one of these, namely, proof of identity via a *modus operandi* theory. *See* Dissenting Opinion at 504, 156 A.3d at 1149–50.[2]

1. *Cf. State v. Griffin,* 887 N.W.2d 257, 268 (Minn. 2016) (Stras, J., concurring) (positing that majority decisions of the Minnesota Supreme Court similarly have conflated the *modus operandi* and common-plan theories of relevance pertaining to other bad acts). *See generally* DAVID P. LEONARD, NEW WIGMORE EVID. OF OTHER MISCONDUCT & SIMILAR EVENTS § 13.5 (2017) [hereinafter, LEONARD, NEW WIGMORE] (explaining the differences between the distinct bases for logical relevance underlying the separate *modus operandi* and common scheme or plan theories); *id.* § 9.2 (observing that courts often mix the "common plan or scheme" ground with other admissibility routes); Edward J. Imwinkelried, *The Plan Theory for Admitting Evidence of the Defendant's Uncharged Crimes: A Microcosm of the Flaws in the Uncharged Misconduct Doctrine,* 50 Mo. L. REV. 1, 4 (1985) (indicating that courts have often misapplied the common plan theory of relevance and, more broadly, the uncharged misconduct doctrine in general); David P. Leonard, The Use of Uncharged Misconduct Evidence to Prove Knowledge, 81 NEB. L. REV. 115, 139 (2002) (opining that "[m]any courts ... have shown a particularly strong tendency toward poorly reasoned decisions in these cases").

2. *Cf. Griffin,* 887 N.W.2d at 269 (Stras, J., concurring) (offering a similar observation about the Minnesota experience with the analogue to Pennsylvania Rule of Evidence 404(b)). *See generally* LEONARD, NEW WIGMORE § 13.6 ("By slow accretion, ... misunderstandings can essentially dissolve the already blurry line between the improper character inference and legitimate *modus operandi* reasoning. Proper use of *modus operandi* evidence depends on the fact-finder's willingness to accept the notion that the actor is identified only by conduct that is truly distinctive."); Paul S. Milich, *The Degrading Character Rule in American Criminal Trials,* 47 GA. L. REV. 775, 778 (2013) (expressing the

My dissent in *Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831 (2014), reflects my belief that the threshold for the use of uncharged misconduct as evidence of *identity* should remain high, in accordance with the signature-crimes analysis related by Justice Donohue. *See* Dissenting Opinion at 496–502, 156 A.3d at 1145–48 (Donohue, J.); *accord Arrington*, 624 Pa. at 555, 86 A.3d at 860–61 (Saylor, J., dissenting).[3]

I do not view the present matter, however, as one truly implicating an identity-based theory of relevance. In this regard, Appellant's attorney conceded to the jury from the outset of the trial that Appellant was in the victim's company at or around the time that she died and that, in the aftermath, he dismembered her body. *See* N.T., Nov. 5, 2014, at 61 (reflecting the concession of counsel that Appellant was guilty of abuse of corpse, including the statements that: "I'm going to tell you that Mr. Hicks put the [victim's severed] hands in the wall" and "threw the body parts out of his car"); *id.* at 68 ("I'm letting you know that he dismembered her[.]"). The sole defense was a claim to the possibility of what the defense dubbed as "drug dumping," *i.e.*, that Appellant may have panicked when the victim purportedly died of an accidental drug overdose, and that he therefore decided to covertly dispose of her body. *Id.* Consequently, a main focus at trial was whether various injuries to the victim were pre-mortem or post-mortem (*i.e.*, intentionally inflicted while Deanna Null was alive or incurred incident to the dismemberment and disposal of her body).[4]

> view that "[t]he history of the 'other uses' exception, currently known as Rule 404(b), is one of inexorable expansion, ultimately swallowing all but the remnants of the prohibition against character evidence.").

3. *See generally* LEONARD, NEW WIGMORE § 13.5 ("Because the legitimacy of [the *modus operandi*] theory's application to any given case depends very highly on the similarity of the charged and uncharged conduct, much greater similarity is required if the character ban is to be maintained."); Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape: People v. Ewoldt Reconsidered*, 29 U.C. DAVIS. L. REV. 355, 384 (1996) ("Similarities between crimes that are common to many criminals do not support admission under the modus operandi rule because the probability of recurrence is high."); *id.* at 366 ("The greatest degree of similarity is required of evidence offered to prove identity.").

4. Parenthetically, from my review of the record, Appellant's position that the extensive bruising suffered by the victim occurred after her

Given this critical aspect of the case, the central relevance at trial of the evidence of Appellant's other assaults upon women went toward negating his defense that the death was an accident. In other words, the evidence was employed by the prosecution primarily to establish the *actus reus* of the murder by corroborating the autopsy report and the testimony for the Commonwealth by a forensic pathologist that the victim's death resulted from "homicidal violence" rather than a mishap. *See* N.T., Nov. 6, 2014, at 14–90 (testimony of Wayne K. Ross, M.D.). This focus clearly enhanced the Commonwealth's claims of relevancy of and necessity for the evidence.[5] Significantly, moreover, the logical relevance of other-bad-acts evidence—so employed to demonstrate lack of accident—does not depend

death seems tenuous. Indeed, the main expert testimony that he offered in support of this point was flatly contradicted by another defense witness, forensic pathologist Isidor Mihalakis, M.D., who strongly agreed with the Commonwealth that the victim died of "[m]ultiple traumatic injuries that resulted in a death." N.T., Nov. 12, 2014, at 76; *see also id.* at 83 ("When you have so much bruising, how can you attribute [the death] to drugs?").

5. *Accord Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988) (indicating that other bad acts evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct"); *United States v. York*, 933 F.2d 1343, 1350 (7th Cir. 1991) ("When the defendant affirmatively denies having the requisite intent by proffering an innocent explanation for his actions, the government is entitled to rebut that argument, 'Evidence of another crime which tends to undermine defendant's innocent explanation for his acts will be admitted.'" (quoting Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence § 404[12] (1990)), *overruled on other grounds Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999); *Wickizer v. State*, 626 N.E.2d 795, 795 (Ind. 1993) ("The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent."); *Wynn v. State*, 351 Md. 307, 718 A.2d 588, 609 (1998) (Raker, J., dissenting) (collecting cases for the proposition that "[o]ther courts have recognized that once a defendant puts forth a defense premised on an innocent or non-culpable state of mind, evidence of other criminal acts which tends to logically refute the claim of an innocent state of mind on a basis other than criminal propensity attains heightened probative value, and thus becomes admissible."). *See generally* John E.B. Myers, Myers on Evid. Interpersonal Violence § 8.06 (2016) ("Numerous cases approve [the admission of other-misconduct evidence] to rebut a claim of accidental injury." (footnote omitted))

on as great a degree of similarity, as between the charged and uncharged misconduct, as is the case under the *modus operandi* theory.[6]

Along these lines, most jurisdictions recognize the "doctrine of chances"—also known as the "doctrine of objective improbability"—as a theory of logical relevance that does not depend on an impermissible inference of bad character, and which is most greatly suited to disproof of accident or mistake. *See, e.g., People v. Spector*, 194 Cal.App.4th 1335, 128 Cal.Rptr.3d 31, 66–67 (2011) ("There is broad consensus that similar acts evidence may be introduced on a doctrine of chances rationale to prove the defendant committed an actus reus when the defendant asserts that he did not cause the ... harm." (quoting Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. Davis L. Rev. at 386)). *See generally* Leonard, New Wigmore § 6.3.1 ("The doctrine of chances theory in this context has been embraced by the large number of courts and commentators." (footnotes omitted)); *id.* § 7.3.2.[7] Application of this

6. *See, e.g., State v. Johns*, 301 Or. 535, 725 P.2d 312, 322 (1986) (contrasting use of uncharged misconduct to prove identity from admission to prove intent, and explaining that the "rigidity" associated with the necessity to establish striking similarity under *modus operandi* theory "is not required when admitting prior acts to prove intent or lack of mistake"); Leonard, New Wigmore § 7.5.2 (indicating, in the course of a discussion of the "intent" theory of logical relevance—of which the treatise author considers lack of accident to be a subset—that "[a]ll agree that charged and uncharged acts need not be as similar to each other as required for the *'modus operandi'* theory' "); Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. Davis. L. Rev. at 406 ("[T]he alleged conduct need not be so unusual so long as the probability of invention is very low, since the probative value of the evidence derives from the improbability of fabricated accusations from diverse sources."); Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 589–90 (1990) (indicting that incidents must be "roughly similar" or "fall into the same general category"); *id.* at 596 ("The degree of similarity between the charged and uncharged incidents need not be as great as the degree required when the prosecutor relies on the *modus operandi* theory to prove identity.").

7. Although the doctrine of chances can be used to prove *mens rea*, it also may apply to establish *actus reus*, or, as in this case, that the victim

principle depends upon "the instinctive logical process that reasonably determines that unusual and abnormal events are unlikely to recur by chance." *People v. Everett*, 250 P.3d 649, 656 (Colo. App. 2010) (citing 2 JOHN WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 302 (Chadbourn rev. 1979)). *See generally* Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non–Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. RICH. L. REV. 419, 439 (2006) (explaining that the doctrine of chances focuses on the objective improbability of coincidence).

As explained by a leading commentator, per the doctrine of chances:

> To determine whether the asserted theory qualifies [as a non-character-based theory of logical relevance], the trial judge must trace the entire chain of inferences underlying the theory. The theory passes muster if the inferential path between the item of evidence and a fact of consequence in the case does not require any inferences as to the defendant's personal, subjective character.
>
> * * *
>
> [T]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the defendant *or the defendant becoming innocently enmeshed in suspicious circumstances so frequently.*

*Id.* at 429, 437 (emphasis added; footnotes omitted); *see also* Cammack, *Using the Doctrine of Chances to Prove Actus*

died from physical violence as opposed to an accidental drug overdose, as Appellant claimed. *See, e.g., People v. Rath*, 44 P.3d 1033, 1042 (Colo. 2002) ("Other-crimes evidence demonstrating a common design or modus operandi has been admitted in prosecutions for sexual assault not only to prove who committed the crime but also to prove that the alleged sex act actually occurred."). *See generally* Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct*, 51 OHIO ST. L.J. at 586–93; Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 384–86.

*Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 378 (explaining, "as in Wigmore's famous example, if a hunter charged with having shot his hunting companion claims that the shooting was accidental, evidence of the defendant's having fired at his companion on other occasions becomes admissible to disprove the claim of accident").[8]

The rationale underlying the doctrine is further developed by another commentator—and distinguished from character-based reasoning—as follows:

> The reasoning of the doctrine of chances theory avoids the forbidden character-based logic, and thus is permissible under current law. It is founded on a logical inference deriving not from the personal characteristics of the actor, but from the external circumstances themselves. The inference is based on informal probability reasoning—reasoning that does not require formal statistical proof, but only the jury's subjective evaluation of likelihood based on intuition and common experience. And in many cases, the intuitive assessment is rather compelling. Could it really be true that a person has received so many stolen vehicles without realizing—at any point—that they were stolen? It is thus possible for one's mind to travel from the evidence to the conclusion without relying on forbidden character reasoning or on the assumption that prior experience would have given the defendant notice of the stolen nature of vehicles ob-

8. *See also* Imwinkelried, *An Evidentiary Paradox*, 40 U. RICH. L. REV. at 461 ("By negatively discrediting the random chance hypothesis, the doctrine affirmatively increased the probability assigned to the hypotheses. Moreover, since the only final conclusion necessarily yielded by the doctrine is that one or some of the incidents are not accidents, logically an assumption of the person's unchanging character cannot be embedded in the doctrine."); Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 388–89 ("The fact that is being proven, the defendant's commission of the criminal act, is established indirectly through a process of elimination. Once the possibility of accident is rendered unlikely, the most plausible explanation for the harm's occurrence is that the defendant caused it." (footnote omitted)); *id.* at 380 ("The probative value of the similar act evidence in disproving the claim of innocence rests on the improbability of non-recurrent similar events recurring by chance.").

tained from a particular source or under similar circumstances.

Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 161–62; *see also id.* at 167 (approving doctrine-of-chances reasoning where it "does not involve a judgment about the defendant's moral character, and thus does not require an inference that the defendant acted in accordance with the character trait so revealed").[9]

I realize that the general restriction on employing character-based reasoning to establish guilt is recognized as a hallmark of the American system of justice. *See, e.g.*, Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 357 (couching the character evidence rule as "a pillar of Anglo–American evidence law"); Benjamin Z. Rice, Comment, *A Voice from People v. Simpson: Reconsidering the Propensity Rule in Spousal Homicide Cases*, 29 LOY. L.A. L. REV. 939, 945 (1996) (indicating that the prohibition against character evidence originated as a response to inquisitorial practices such as those of the Star Chamber (citation omitted)). Nevertheless, there remains a material difference between the use of

9. *See also* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 407 n.213 (citing Edward J. Imwinkelried, *A Small Contribution to the Debate Over the Proposed Legislation Abolishing the Character Evidence Prohibition in Sex Offense Prosecutions*, 44 SYRACUSE L. REV. 1125, 1136–37 (1993), for the proposition that "similar accusations evidence invites jurors to focus on objective improbability of repeated accusations rather than the subjective character of the accused"); Leonard, *Use of Uncharged Misconduct Evidence*, 81 NEB. L. REV. at 162 ("Doctrine of chances reasoning does not involve an inference of knowledge on one occasion from proof of knowledge on one or more prior occasions. Rather, each occasion lessens the likelihood of innocent knowledge in each other occasion."); Imwinkelried, *An Evidentiary Paradox*, 40 U. RICH. L. REV. at 439 ("The doctrine does not ask the jurors to utilize the defendant's propensity as the basis for a prediction of conduct on the alleged occasion. Instead, the doctrine asks the jurors to consider the objective improbability of a coincidence in assessing the plausibility of a defendant's claim that a loss was the product of an accident or that he or she was accidentally enmeshed in suspicious circumstances."). *See generally Johns*, 725 P.2d at 322–24 (offering an extensive development of the doctrine of chances, with reference to the teachings of Professors Wigmore and Imwinkelried).

evidence to prove "general evil disposition" and advancement to demonstrate "the intention which composes a part of the crime," including a lack of accident or mistake. *Johns*, 725 P.2d at 322 n.2 (quoting *United States v. Burr*, 25 F.Cas. 52, 54 (C.C.D. Va. 1807)).

Hence, I find that the doctrine of chances represents a non-character-based path of logical reasoning that sufficiently comports with the ideals underlying Rule of Evidence 404, as well as its express terms. *See generally Cammack, Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 377 (characterizing the doctrine of chances as an "alternative non-character theory of relevance" that best "captures the court[s'] intuition regarding the significance of similarity when uncharged acts are used to prove actus reus"). That the evidence might also tend to demonstrate bad character is not itself controlling,[10] but rather, implicates the additional protective measure prescribed in Rule 404(b) and otherwise. *See* Pa.R.E. 404(b)(2)

10. *See* Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. DAVIS. L. REV. at 357–58 (explaining that the rule governing character evidence "does not proscribe the admission of evidence of a person's character per se," but rather, "prohibits one use of the evidence," in that the evidence "may not be used to support an inference that because the actor has a particular character trait—dishonesty, for example—she acted consistently with that trait—dishonesty—on some given occasion"); *id.* at 340 ("The character evidence ban does not preclude the use of such evidence as long as the evidence is being offered for a non-propensity purpose."); *cf. United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992) (noting that the basic rule governing the admissibility of character evidence is inclusive in nature, rather than exclusive); 23 C.J.S. CRIMINAL PROCEDURE AND RIGHTS OF ACCUSED § 1125 (2016) (discussing the additional "latitude in admitting other crimes evidence" where "[t]he list of purposes in an inclusionary rule of evidence are only examples of exceptions to the general prohibition").

In terms of the inclusive quality of Rule 404(b), I also note that the threshold for relevance under Rule of Evidence 401 is a relatively low one. See Pa.R.E. 401 ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action."). *See generally* LEONARD, NEW WIGMORE § 7.3.2 ("[B]ecause of the minimal definition of 'relevant evidence' that prevails in modern evidence law, the logic of the doctrine of chances can be applied to a wide variety of situations.").

("In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice."). Notably, the defense may also secure limiting and cautionary instructions to guard against impermissible character-based reasoning. *See, e.g., Commonwealth v. Jemison*, 626 Pa. 489, 503, 98 A.3d 1254, 1263 (2014) ("Any possibility of unfair prejudice is greatly mitigated by the use of proper cautionary instructions to the jury, directing them to consider the defendant's prior offense [for a relevant, non-character-based purpose], not as evidence of the defendant's bad character or propensity to commit crime.").

The decision in *Spector*, 128 Cal.Rptr.3d 31, offers a salient example of the application of the doctrine of chances in the context of a a murder prosecution following the shooting death of a woman. There, the defendant claimed that the victim committed suicide or shot herself accidentally. To disprove these defense theories, per the doctrine of chances, the appellate court sanctioned the admission of evidence that the defendant had committed several previous armed assaults upon women, over a period spanning 28 years, and within a fairly discrete set of circumstances.[11] *Id.* at 65–68 ("[T]he evidence tended to show, by operation of the doctrine of chances, the unlikelihood that this time it was the woman, not Spector, who reached for a gun.").

In *Johns*, 725 P.2d 312, the Oregon Supreme Court approved the admission of evidence of previous armed assaults in a murder prosecution in which the defendant claimed that his wife's shooting death was an accident. One of those incidents involved a former wife and had occurred six years before the killing. *See id.* at 315; *see also* LEONARD, NEW WIGMORE § 7.5.3 (crediting the logic of the *Johns* court, given that the defense had claimed accident, making the necessity for the evidence "more palpable" and admission "considerably easier to justi-

---

11. The particular circumstances involved evidence that "when fueled by alcohol and faced with a lack or loss of control over a woman who was alone with him and in whom he had a romantic or sexual interest, Spector underwent a sharp mood swing, exhibited extreme anger, and threatened the woman with a gun when she refused to do his bidding." *Spector*, 128 Cal.Rptr.3d at 73.

fy"). Although the Oregon Supreme Court acknowledged that reasonable minds could differ as to the admissibility of this evidence, it "defer[red] to the veteran trial judge who was better able to decide the evidence's effect on the jury after hearing and observing the many witnesses throughout the lengthy trial." *Johns*, 725 P.2d at 326; *accord Commonwealth v. Hoover*, 630 Pa. 599, 610, 107 A.3d 723, 729 (2014) (stressing the deferential abuse-of-discretion standard applied by appellate courts on review of trial-court evidentiary rulings, per which such determinations cannot be disturbed " 'merely because an appellate court might have reached a different conclusion, but [reversal] requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous,' " or a demonstration that "the law is either overridden or misapplied" (citations omitted)).

And in *Douglas v. People*, 969 P.2d 1201 (Colo. 1998), the Colorado Supreme Court sanctioned the admission of evidence that a defendant had previously threatened his girlfriend and a neighbor with firearms, in a case in which he had been charged with menacing with a firearm and claimed self defense. *See id.* at 1206;[12] *see also People v. Kelly*, 895 N.W.2d 230, 235 & n.4, 2016 WL 5329749, n.4 (Mich. Ct. App. 2016) (*per curiam* ) (finding that a trial court had abused its discretion by excluding proposed testimony, in a sexual assault case in which the defense claimed consent, concerning seven prior assault cases occurring over 25 years on the theory that, "employing the doctrine of chances, it strikes us as extraordinarily improbable that eight unrelated women in four different states would fabricate reports of sexual assaults after engaging in consensual sex with defendant"). *See generally* Marjorie A. Shields, *Application of "Doctrine of Chances" in Homicide, Sexual Crimes, and other Offenses Against the Person*, 11 A.L.R.7th Art. 1 (2015) ("The doctrine of chances has been used to determine that admissibility of evidence of extrinsic

12. Significantly, the court also observed that "[h]ad Douglas not asserted his claims of self-defense, there may not have been any logical relevance independent of showing his bad character as prohibited by CRE 404(b)." *Douglas*, 969 P.2d at 1206.

acts to prove intent, knowledge, or absence of mistake or accident in homicide, sexual crimes, and other crimes against the person. In other words, the more often the defendant commits the actus reus, the less is the likelihood that the defendant acted accidentally or innocently.").

There is no question that the doctrine of chances must be applied with substantial caution, given the potential to associate the rationale with a propensity-based inference. *See, e.g.,* LEONARD, NEW WIGMORE § 7.3.2 (explaining, with reference to an example of the doctrine's application, that, "[t]hough this is close to the forbidden character-based reasoning, it does not cross the line" (footnote omitted)).[13] One court summarized this cautionary advice, and associated safeguards, as follows:

At least one commentator, Professor Edward Imwinkelried, urges courts to be cautious when deciding whether to allow the prosecution to introduce evidence of other acts and rely on the doctrine of chances to prove the actus reus. This is so because "[i]f uncharged misconduct becomes routinely admissible to prove the actus reus, there will be little left to the prohibition" that such evidence cannot be used to prove that a defendant acted in conformity with his or her character.

To protect against the exception swallowing the rule, Professor Imwinkelried recommends that the trial court determine whether the prosecution has satisfied three criteria. First, is the evidence of other acts roughly similar to the charged crime? Second, does the number of unusual occurrences in which the defendant has been involved exceed the frequency rate for the general population? Third, is there a real dispute between the prosecution and the defense over whether the actus reus occurred?

**13.** *Accord* MYERS ON EVID. INTERPERSONAL VIOLENCE § 8.06 (noting the closeness between a strain of non-character-based logic and propensity-based reasoning, while concluding that "[s]ince the prevailing view is logically defensible, the theory survives," and "[d]efendant's remedy is to request a limiting instruction cautioning the jury not to use the evidence as proof of bad character" and to "argue that the probative value of the evidence is substantially outweighed by the danger of jury confusion and unfair prejudice").

*People v. Everett*, 250 P.3d 649, 658 (Colo. App. 2010) (quoting and citing Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct*, 51 Ohio St. L.J. at 589–93) (internal citations omitted).

In the present case, as previously discussed, the defense at Appellant's trial disputed the *actus reus* of the murder and affirmatively claimed accident. In response, the prosecution sought to admit multiple instances in which Appellant had previously attacked women in circumstances bearing a degree of commonality. *See* Majority Opinion at 467–68, 156 A.3d at 1127. Although I respectfully but greatly disagree with the majority's depiction of these incidents as "strikingly similar" to the killing of Ms. Null, or as reflecting a "virtual signature," *id.* at 467–69, 156 A.3d at 1127–28, I do find them to be "roughly similar" and as substantially "fall[ing] into the same general category," Imwinkelreid, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea*, 51 Ohio St. L.J. at 589–90, along the lines of the *Spector* and *Johns* cases. *See generally* Leonard, *Use of Uncharged Misconduct Evidence*, 81 Neb. L. Rev. at 163 ("One advantage of the doctrine of chances theory is that it does not apply only to cases in which there is remarkable similarity between the uncharged and the charged acts."); *see also supra* note 6. Moreover, I conclude that there were a sufficient number of incidents to dispel the appearance of coincidence, making it less likely that accident accounted for Appellant's undisputed involvement in the chain of circumstances giving rise to his being held to account for murder. *See supra* notes 8–9 and accompanying text.

Notably, although the prosecution did not raise the doctrine of chances by name, it did observe that "the need for the other crimes evidence is high in that the case against the defendant is primarily based on circumstantial evidence *and the defendant has already placed [in] issue the precise cause and manner of the victim's death*." Offers of Proof dated Apr. 27, 2011, in *Commonwealth v. Hicks*, No. 391–2008 (C.P. Monroe), at ¶ 15 (emphasis added).[14] *See generally* Kenneth W. Graham,

14. *See generally* Leonard, *Use of Uncharged Misconduct Evidence*, 81 Neb. L. Rev. at 160 (observing that doctrine-of-chance logic is "not

JR., 22B FED. PRAC. & PROC. EVID. § 5247 (1st ed. 2016) ("[E]ven in cases where mistake or accident seems unlikely, the defense can raise such a claim and open the door to rebuttal by other crimes evidence."). To the degree that the Commonwealth's focus is viewed as distinct, an appellate court has the ability to affirm a valid verdict for any reason appearing as of record. *See, e.g., Pa. Dep't of Banking v. NCAS of Del., LLC,* 596 Pa. 638, 653, 948 A.2d 752, 761–62 (2008).

Here, Appellant's history of violent attacks upon women certainly reduced the probability that, having been found to be closely associated with a badly bruised body of a woman whom the Commonwealth contended had been choked, there is an innocent explanation for his involvement prior to his admitted dismemberment of the body. Although I agree with the courts and commentators that the distinction between this line of reasoning and an impermissible propensity-based inference may be modest, I believe that it is enough to satisfy that logical non-character-based relevance criterion and to maintain the essential guard against inquisitorial-style determinations of guilt by character.[15]

That said, I reiterate that Rule 404(b) requires trial courts to determine "if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). In this respect, I maintain concerns about the power of potentially inevitable character inferences associated with other-acts evi-

always labeled as such"); *id.* at 164 ("Courts often employ doctrine of chances reasoning without labeling it as such, suggesting that the theory is probably far more ubiquitous in the cases than might first appear.").

15. *Accord Douglas,* 969 P.2d at 1208 ("[W]hile [Rule 404] is designed to protect parties, especially criminal defendants, from the human tendency to permit notions of bad character to carry the day, at the same time, it recognizes that the difficult task of fact-finding is better facilitated when, if not unduly prejudicial, relevant evidence is admitted." (citing J.W. STRONG, MCCORMICK ON EVIDENCE § 190 (4th ed. 1992)); *Cammack, Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape,* 29 U.C. DAVIS. L. REV. at 411 n.225 ("The doctrine of chances focuses attention on the improbability of repeated false accusations against the same person, rather than the defendant's subjective character, and therefore minimizes the danger of misuse."); *see also supra* note 13.

dence, with requiring defendants to effectively defend mini-trials concerning collateral matters, and about the efficacy of jury instructions in this context.[16] Nevertheless, as I read Appellant's brief, the focus of his argument is upon the position that a high degree of similarity is required to establish relevance not only under *modus operandi* theory, but also to demonstrate lack of accident.[17] Accordingly, from my point of view, my difference with such position is enough to conclude my review of the present appeal.[18]

Finally, I appreciate that the judicial treatment of the admission of evidence of uncharged misconduct in criminal cases has been the subject of intense and sustained critical commentary. *See, e.g.*, Milich, *The Degrading Character Rule*, 47 GA. L. REV. at 776 ("Many cases and scholarly articles have detailed the convoluted, contradictory, and absurd aspects and

**16.** *See generally* Milich, The Degrading Character Rule, 47 GA. L. REV. at 789 (positing that "the typical limiting instruction offers nothing more than a confusing distinction between the proper and improper use of the evidence"); David A. Sonenshein, *The Misuse of Rule 404(b) on the Issue of Intent in the Federal Courts*, 45 CREIGHTON L. REV. 215, 264–67, 270–71 (2011) (discussing social science research concerning juror misuse of evidence of other misconduct and the asserted non-efficacy of limiting and cautionary instructions); Reed, *Admitting the Accused's Criminal History: The Trouble With Rule 404(b)*, 78 TEMP. L. REV. at 243 (indicating that "very few commentators believe that [limiting] instructions really curb the jury's common-sense use of uncharged misconduct").

**17.** I recognize that Appellant devotes several pages of his brief to an abstract discussion of Rule 404(b)'s requirement to balance probative value against prejudicial impact. See Brief for Appellant at 8–10. He does not, however, meaningfully apply that analysis to the circumstances of the case, including the critical reliance by the defense on the suggestion of an accident. Accordingly, as with the broader themes noted above, I do not consider this aspect to be sufficiently developed for present consideration.

**18.** In terms of the presumption of innocence, I observe that the trial court explicitly directed the jury at Appellant's trial to apply such presumption, *see* N.T., Nov. 14, 2014, at 95–96, and again, Appellant does not offer any basis to contest the prevailing assumption that jurors follow the charges from the court. *See, e.g.*, Jemison, 626 Pa. at 503, 98 A.3d at 1263. Furthermore, I note that some American evidence codes liberally allow for the admission of prior bad acts. *See, e.g.*, F.R.E. 413(a) (sanctioning the admission, in sexual assault cases, of a broad range of evidence "that the defendant committed any other sexual assault"); *see also* F.R.E. 414(a) (same for child molestation).

applications of the character rule."); *United States v. Davis,*
726 F.3d 434, 441 (3d Cir. 2013) (observing that, "[u]ncontr-
oversial at the time of adoption, Rule 404(b) has become the
most cited evidentiary rule on appeal" (citing Thomas J. Reed,
*Admitting the Accused's Criminal History: The Trouble with
Rule 404(b),* 78 TEMP. L.REV. 201, 211 (2005)). *See generally* 2
JOHN H. WIGMORE, EVIDENCE § 302 (Chadbourne rev. 1979)
(highlighting, in a survey of cases, "bewildering variances of
rulings in the different jurisdictions and even in the same
jurisdiction"). It may well be that the interests of justice would
be well served were this Court to consider revamping the
present approach. *See, e.g.,* Milich, *The Degrading Character
Rule,* 47 GA. L. REV. at 776 (arguing that the "propensity
inference is an unreliable proxy for undesirable character
evidence, and efforts to faithfully apply the propensity rule
often lead to confusion and frustration"); Reed, *Admitting the
Accused's Criminal History,* 78 TEMP. L. REV. at 250–53
(reflecting a proposal for change).

Nevertheless, the fact of the matter is that our present
rules recognize that many non-character-based theories of
logical relevance may generate character-based inferences and
depend on case-specific screening for prejudice and jury in-
structions to guard against impermissible use of other-acts
evidence. Again, I find that it would proceed well beyond the
scope of the present appeal, as framed, to delve further into
the deeper issues.[19]

19. Certainly, I support the approach of other courts to sharpen the
admissibility calculus within the presently prevailing framework. *See,
e.g., United States v. Gomez,* 763 F.3d 845, 855 (7th Cir. 2014) (estab-
lishing a protocol for the admission of evidence of uncharged miscon-
duct, requiring, *inter alia,* that the proponent of the other-act evidence
should address the supporting chain of logical relevancy specifically
and directly, "without the straightjacket of an artificial checklist");
*Davis,* 726 F.3d at 442 (requiring detailed, focused, on-the-record
reasoning to support the admission of evidence of other bad acts, while
stressing that "a mere recitation of the purposes in Rule 404(b)(2) is
insufficient"); *United States v. Morley,* 199 F.3d 129, 137 (3d Cir. 1999)
("Neither a trial court nor an appellate court is comforted when a
proponent attempts to justify 'bad act' evidence by resorting to a
mantra-like recitation of the provisions of Rule 404(b)."); *Johns,* 725
P.2d at 317–321 (emphasizing the need to isolate the theory of logical
relevance appropriate to a particular case, rather than reciting the non-

In summary, although I join in the analysis of evidentiary sufficiency and the statutory review of the verdict aptly rendered by the majority, I concur in the result concerning the treatment of the other-acts evidence based upon a different rationale.

JUSTICE BAER, Concurring

I agree with the majority that Appellant is not entitled to a new trial based on his contention that the trial court erred in admitting evidence of his prior bad acts pursuant to Pa.R.E. 404(b). While I acknowledge that the substantive evidentiary ruling in this case presents a close call, I find it unnecessary to reach that issue. In my view, even assuming it was error to admit this evidence pursuant to Rule 404(b), that error was harmless under the factual predicate before us. Specifically, the Commonwealth proved its case beyond a reasonable doubt without the Rule 404(b) evidence and its admission, whether proper or not, had no effect on the jury's verdict. I cannot countenance granting Appellant a new trial under such circumstances. Accordingly, I concur in the majority's decision to affirm the judgment of sentence.

It is well-established that an erroneous evidentiary ruling by a trial court does not require us to grant relief where the error was harmless. *Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 193 (1999). Specifically, we have held that harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming that the prejudicial effect of the error by comparison could not have contributed to

exclusive list of exceptions set forth in Rule 404(b), while contextualizing the case under review as follows: "the logical relevance theory for which the 'prior crime' evidence was offered is restricted to intent," and "[i]t follow that we are not discussing admissibility ... under any theory of motive, opportunity, preparation, plan, knowledge or identity or any other unlisted theory").

Although certainly such level of precision was in no way observed in the present case, again, this is not a particularized basis on which the appeal has been grounded.

the verdict. *Id.* We have explained that the doctrine of harmless error is a "technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that a defendant is entitled to a fair trial but not a perfect one." *Commonwealth v. Allshouse*, 614 Pa. 229, 36 A.3d 163, 182 (2012) (citation and internal quotations omitted).

As Justice Wecht notes in his dissenting opinion, there are two seemingly incompatible pronouncements from this Court with respect to the Commonwealth's burden to raise harmless error. Traditionally, we have held that the Commonwealth must establish beyond a reasonable doubt that an error was harmless. *See, e.g., Commonwealth v. Mayhue*, 536 Pa. 271, 639 A.2d 421, 433 (1994). More recently, however, this Court has recognized that we may affirm a judgment based on harmless error even if that argument was not raised by the Commonwealth because "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." *Commonwealth v. Moore*, 594 Pa. 619, 937 A.2d 1062, 1073 (2007); *see also, Allshouse, supra* (finding that violation of the defendant's constitutional right of confrontation was harmless despite the Commonwealth's failure to raise harmless error argument on appeal). Thus, while ordinarily the Commonwealth has the burden of persuasion [1] when it asserts that a particular error was harmless, *sua sponte* invocation of the harmless error doctrine is not inappropriate as it does nothing more than affirm a valid judgment of sentence on an alternative basis.

I appreciate that, in seeking the admissibility of the Rule 404(b) evidence in this case, the Commonwealth filed an

---

[1]. While much of the case law in this regard states that the Commonwealth has a "burden of proof," in my view, it is more accurately described as a burden of persuasion. *See, e.g., Commonwealth v. Enimpah*, 630 Pa. 357, 106 A.3d 695, 704 (2014) (Saylor, J. concurring) (noting that courts are often imprecise when addressing burdens of proof and observing that the term burden of proof is sometimes used to refer to the burden of persuasion) (citation omitted).

interlocutory appeal of the trial court's pretrial ruling in which it argued that the evidence was needed in order to move forward with Appellant's first degree murder prosecution. *See* Pa.R.A.P. 311(d) (providing that the Commonwealth may file an appeal in a criminal case "from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution."). In an apparent effort to maintain consistency in its position, the Commonwealth did not raise harmless error in the instant appeal and reiterated at oral argument before this Court that it was not pursuing harmless error. The Commonwealth's position in this regard, however, does not prevent this Court from examining the harmless error doctrine. Rather, the determination that an error is harmless is a legal determination and an appellate court is not bound by the Commonwealth's concession.

*Sua sponte* invocation of harmless error under these circumstances is consistent with both the rationale undergirding the harmless error doctrine and the well-established principle that an appellate court can affirm a valid judgment for any reason appearing of record. While this Court should exercise restraint when invoking the right for any reason doctrine and in finding harmless error *sua sponte*, it is appropriate where, as here, the Commonwealth has demonstrated the defendant's guilt beyond a reasonable doubt and retrying the defendant would be a waste of judicial resources. Moreover, *sua sponte* application of harmless error in a capital case is not novel. *See Moore, supra,* (finding harmless error in a capital case where the trial court erroneously admitted hearsay evidence despite the Commonwealth's failure to assert that the error was harmless). Thus, regardless of the Commonwealth's position, I do not believe we are precluded from *sua sponte* deeming an error to be harmless based upon our independent review of the record before us. For the reasons described below, I conclude that the prejudicial effect of the admission of the Rule 404(b) evidence was insignificant compared to the remaining overwhelming evidence of Appellant's guilt such that it did not contribute to the verdict in this case.

This case, in which Appellant was accused of both homicide and abuse of a corpse, is far from typical. Ordinarily, it would be highly suggestive that a defendant was guilty of murder in light of evidence that: the defendant was the last person to be seen with the deceased before she went missing; that multiple garbage bags containing her dismembered body parts were found within miles of the defendant's home; that garbage bags matching those which contained her dismembered body parts where discovered in the defendant's home; and that her severed hands were discovered inside the wall of the defendant's bedroom closet. However, in order to avoid a homicide conviction, Appellant's trial strategy here was to acknowledge that he was with the victim around the time of her death and maintain that he dismembered and disposed of her body in a moment of panic after she died of a drug overdose. *See* N.T., 11/5/2014, at 61–68 (counsel for Appellant stating "I'm [ ] going to tell you that Mr. Hicks is guilty of abuse of a corpse" and opining that the victim died of a drug overdose). Consequently, the guilt-determinative question for the jury was whether the victim's manner of death was homicide or a drug overdose and much of the trial centered on whether there were any indications that she sustained fatal injuries before she was dismembered by Appellant.

In this regard, the Commonwealth presented expert testimony which, *inter alia,* posited that the victim suffered extensive injuries while she was still alive and that the manner of her death was homicide. In particular, the Commonwealth's expert pathologist Dr. Wayne K. Ross testified that the victim suffered blunt force trauma to her head prior to her death, likely inflicted by a crowbar, pipe or claw end of a hammer. N.T. 11/6/2014 at 35–42. Dr. Ross further testified that, in his view, the victim's death was a homicide, likely the result of a combination of strangulation and sharp force injury to her neck. N.T. 11/6/2014, at 90.

Standing alone, however, the testimony of the Commonwealth's expert pathologist does not conclusively resolve the issue regarding the manner of the victim's death. Far from contradicting Dr. Ross's ultimate conclusion, however, Appel-

lant's experts in fact bolstered the Commonwealth's claim that the victim suffered multiple impacts to her head and body while she was still alive and that the manner of her death was homicide. Indeed, while disagreeing as to the nature of certain of the victim's injuries, both of Appellant's expert pathologists, Dr. John Shane and Dr. Isidore Mihalakis, testified as to their conclusions that the manner of the victim's death was homicide. *See, e.g.*, N.T. 11/12/2014, at 43–45 (cross-examination of Dr. Shane in which he agreed that he would call the victim's death a homicide); N.T., 11/12/2014, at 76 (testimony of Dr. Mihalakis stating that the victim died of "homicidal violence" due to "multiple traumatic injuries that resulted in death.").[2] Therefore, the Commonwealth's expert testimony in this case, that the victim suffered extensive pre-mortem injuries and that the manner of her death was homicide, was in fact corroborated by Appellant's experts. Consequently, Appellant's theory of death by drug overdose was reduced to nothing more than a bald assertion unsupported by any expert testimony.

In light of this overwhelming, and indeed uncontradicted, evidence as to the manner of the victim's death, the Rule 404(b) testimony simply did not contribute to the jury's verdict in this case. Rather, the jury's determination was based upon the testimony from all three experts that the manner of the victim's death was homicide, rather than a drug overdose. Coupled with the fact that Appellant was the last person to be seen with the victim before she was reported missing, that the victim's dismembered body parts were found within miles of

2. As Justice Donohue observes in her dissenting opinion, Dr. Shane initially testified in favor of Appellant's drug overdose theory and disagreed with the Commonwealth's experts as to the pre-mortem nature of the victim's injuries and on the specific issue of whether there was evidence of strangulation. However, he apparently abandoned this conclusion when he ultimately opined that the manner of victim's death was homicide. *See* N.T. 11/12/14, at 44–45. Moreover, at no point did Appellant's second expert, Dr. Mihalakas, testify that the victim died of a drug overdose. Rather, Dr. Mihalakas testified that the victim sustained extensive pre-mortem injuries, including blunt force trauma while she was still alive, and explicitly discounted that the victim died of a drug overdose. N.T., 11/12/2014, at 83 (stating "[w]hen you have so much bruising, how can you attribute [her death] to drugs?").

the Appellant's home (and Appellant acknowledged dismembering the victim), that garbage bags matching those which contained her dismembered body parts where discovered in his home, and that the victim's severed hands were uncovered in the wall of his bedroom closet, the properly admitted and uncontradicted evidence at trial was sufficient to establish beyond a reasonable doubt that the victim was murdered and that Appellant was the responsible party. Consequently, I conclude that even if the trial court erroneously admitted the Rule 404(b) evidence, the prejudicial effect of that evidence was insignificant compared to the remaining evidence of Appellant's guilt and that the error was therefore harmless. Accordingly, I concur with the majority's decision to affirm the judgment of sentence.

JUSTICE DONOHUE, Dissenting

I am compelled to dissent from the Majority's analysis and ultimate allowance of the bad acts evidence in this case. In my view, the Majority contorts the exceptions to the prohibition against the admission of bad acts evidence, thereby stripping the Appellant, Charles Ray Hicks (Hicks), of his presumption of innocence and allowing a conviction based upon Hicks' prior propensity to commit violent acts.

Historically, this Court has held that use of prior bad acts evidence should be strictly limited—recognizing that "[i]t is not proper to raise a presumption of guilt on the ground that, having committed one crime, the depravity it exhibits makes it likely [the same person] would commit another," thereby relieving the Commonwealth of its constitutional burden of proof beyond a reasonable doubt. *Shaffner v. Commonwealth*, 72 Pa. 60, 65 (1872). Rule 404(b)[1] was adopted to codify our

1. Pennsylvania Rule of Evidence 404(b) was enacted in 1998 and its basic principle was intended to be consistent with both Federal Rule of Evidence 404 and prior Pennsylvania case law. *See* Pa.R.E. 404, Order of Feb. 28, 2006, Cmt. Rule 404(b) provides:

(1) Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

common law prohibition on the admission of propensity evidence while also providing, as at common law, that bad acts may be admissible, under special circumstances, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *See* Pa.R.E. 404(b). To patrol the boundaries between the prohibition and its exceptions, we have consistently required evidence of purportedly admissible bad acts to evince either signature-like similarities or a true logical connection to the charged crime.

The Majority posits that the testimony of Kim Alston, Misty Chavez and Lakisha Washington was probative of Hicks' common scheme, intent, lack of accident, and identity. Majority Op. at 467–68, 469–70, 156 A.3d at 1127, 1128. Under the guise of our established standards, but in fact advancing a troubling departure therefrom, the Majority allows evidence of three alleged choking incidents—bearing little relationship either to this case or to each other—as proof that Hicks beheaded the victim in this case with a saw blade. The Commonwealth conceded that it needed the bad acts testimony to prove its case.[2]

At most, the bad acts evidence admitted in this case is probative of Hicks' status as a drug-addicted man who, when faced with similar, random encounters, has (allegedly) exhibited violent tendencies toward women. Because the similarities

(2) This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.
(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.
Pa.R.E. 404(b).

**2.** The Commonwealth argues "the bad acts evidence was necessary in this circumstantial evidence case. The evidence rebutted any defense of accident. The evidence established a motive for the crime. The evidence helped to identify the defendant as the perpetrator of the murder. The evidence also helped the fact finder in determining the defendant's intent at the time of the murder." Commonwealth's Brief at 1; *see also infra*, pp. 515–16, 156 A.3d at 1156–57. That bad acts evidence is helpful, or even necessary, does not render it admissible. Indeed, such evidence is typically exceptionally helpful to the Commonwealth but if it does not evince a logical connection to the crime at issue or a true signature, it should not be allowed.

between the circumstances surrounding the victim's death and those of the prior bad acts are grossly insufficient to establish a true signature, no grounds exist for proving identity, common scheme, intent or lack of accident. And because the bad acts do not support an inference that Hicks conceived of a single, overarching plan encompassing each of the prior acts and the charged crime, the testimony does not demonstrate a logical connection for purposes of showing motive or common scheme. Therefore, I would hold that the trial court abused its discretion in allowing the Commonwealth to introduce its 404(b) evidence.

Two exceptions to the prohibition against propensity evidence are embedded in our decisional law: Bad act evidence is admissible if 1) a logical connection exists between the bad acts and the crime on trial, linking them together for some purpose the defendant intended to accomplish, or 2) the bad acts evince a signature crime. These principles derive from our landmark decision in *Shaffner v. Commonwealth*:

> To make one criminal act evidence of another, [1] a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; **or** [2] it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other.

*Shaffner*, 72 Pa. at 65 (emphasis added); *see also* Majority Op. at 463–64, 156 A.3d at 1125. *Shaffner* thus provides substantial guidance as to the type of link that will create an exception to the "general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner." *Shaffner*, 72 Pa. at 65. If such a link exists, bad act evidence may be admitted to prove motive, common scheme, intent, lack of accident, or identity, so long as the evidence is more probative than prejudicial. *See* Rule 404(b).[3]

---

3. Although there is significant overlap between the various 404(b)(2) purposes, it is my view that a "signature" does not itself establish a "common scheme," even though a "signature" and a "common scheme" may, for example, both prove identity. *See infra*, pp. 498–99, 156 A.3d at 1146–47; *cf.* McCormick, Evidence, § 190 (2013 7th ed.) (citing Stone, Exclusion of Similar Fact Evidence: America, 51 Harv.

In *Shaffner*, the defendant stood trial for murdering his wife. The Commonwealth sought to offer bad act evidence at trial that:

John Sharlock died from poison, the same kind of which Nancy, the [defendant]'s wife, died; that his symptoms were the same as hers, that the [defendant] attended upon both, and that both died at the [defendant]'s house; Sharlock on the 17th of February 1871, and Nancy, the wife, on the 11th of June 1871. In substance, this was an offer to show that the [defendant] poisoned Sharlock, as evidence that he also poisoned his own wife.

*Shaffner*, 72 Pa. at 65–66. Despite some apparent similarities between the circumstances surrounding the death of Sharlock, the defendant's paramour's husband, and the death of the defendant's wife, we held the evidence of Sharlock's death lacked the required connection to the death of Nancy.

It is obvious that to connect together the deaths of Sharlock and Nancy, and make the former bear upon the latter, they must have been both contemplated by the prisoner as parts of one plan in his mind, in which the taking of Sharlock's life was part of his purpose of taking the life of Nancy. He must, therefore, have contemplated the death of Nancy before taking the life of Sharlock. In order to let in the poisoning of Sharlock, the judge must have had before his mind some fact or facts exhibiting this pre-existing determination to take Nancy's life. Herein the evidence was defective.

*Id.* (cautioning that "if the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner," and concluding that the other act evidence was inadmissible).

Thus, to show motive, plan, design or scheme (which in turn may tend to show identity, intent, absence of accident, or some other fact in issue), it must be possible to conclude that the

L. Rev. 988, 1026 n.190 (1938) ("Motive, intent, absence of mistake, plan and identity are not really all on the same plane. Intent, absence of mistake, and identity are facts in issue—facta probanda. Motive, plan, or scheme are facta probantia, and may tend to show any facta probanda.")

bad acts and the charged crime were "both contemplated by the prisoner as parts of one plan in his mind" such that "it is obvious" that committing the prior act "was part of his purpose" in committing the charged crime. *Id.*[4] It must appear "that the other offenses, though distinct crimes, are in fact ... part of a larger field of operation, previously conceived and in part executed." *Commonwealth v. Chalfa*, 313 Pa. 175, 169 A. 564, 565 (1933) (citing *Shaffner*, 72 Pa. at 65); *see also Commonwealth v. Weiss*, 284 Pa. 105, 130 A. 403, 404 (1925) (explaining "if the act which is proven may indicate the motive or plan of action of the defendant, either preceding or following the commission of the crime, and is so closely joined thereto as to show the probability that he was guilty of the offense charged, it can be properly received"); *Commonwealth v. Schwartz*, 445 Pa. 515, 285 A.2d 154, 158 (1971) (excluding evidence "to show intent[,] design or motive for ... killing" a police officer where the prior shooting of another police officer did not "give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances"); *see also* McCormick, Evidence, § 190 (2013 7th ed.) (cautioning that to prove the existence of a common scheme, "each crime should be an integral part of an over-arching plan explicitly conceived and executed by the defendant"). Absent a true plan or motive, mere similarities between the bad acts and the crime on trial are insufficient to establish grounds for admissibility.

A second way "to make one criminal act evidence of another" is to demonstrate "a connection [showing] that he who committed the one must have done other," making it impossible not to "identify the person of the actor." *Shaffner*, 72 Pa. at 65. To this end, for the purpose of proving identity, we have consistently held that the bad acts and the crime on trial must share "an almost uncanny similarity in all the details." *Commonwealth v. Wable*, 382 Pa. 80, 114 A.2d 334, 337 (1955). Further clarifying the high bar for admissibility based on similar acts, our Court has explained that bad act evidence is

---

4. Or vice versa, in the case of subsequent act evidence.

admissible to prove the accused committed the crime on trial, when the incidents are:

so nearly identical in method as to earmark them as the handiwork of the accused. Here **much more is demanded than the mere repeated commission of crimes of the same class,** such as repeated burglaries or thefts. The devise used must be **so unusual and distinctive as to be like a signature.**

*Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557, 560–61 (1994) (citing McCormick, Evidence, § 190 (1972 2d ed.) (emphasis added); *Commonwealth v. Bryant*, 515 Pa. 473, 530 A.2d 83, 86 (1987) (*"Bryant I"*). In sum, where the circumstances surrounding each of the crimes demonstrate a distinctive signature method, the connection between the bad acts and the crime on trial is sufficient, and allowing the bad acts to be evidence of the crime charged is appropriate.

By way of example, in *Wable*, the defendant was on trial for the murder of Harry Pitts, a truck driver who was shot in the head on July 28, 1953 while asleep in the cab of his truck on the Pennsylvania Turnpike. *Wable*, 114 A.2d at 336. The trial court admitted evidence of two other crimes—a July 25, 1953 murder and a July 31, 1953 shooting—both perpetrated against truck drivers sleeping in their cabs on or near the Pennsylvania Turnpike. In holding that the trial court's admission of evidence was proper, this Court articulated the "signature" nature of the crimes:

Apart from the fact, however, that the crimes all occurred at three day intervals and two of them in the same neighborhood, there was a **striking similarity** in the manner in which they were committed. Woodward and Pitts were each found lying on the seat of his cab with his head against the door and resting on a pillow. Each had apparently been attacked in the early morning hours. In each instance the murderer had poked his gun through the door window and shot his victim in the head, death being instantaneous. In each instance the bullet had entered the head at about the same angle. In each instance the motive was evidently robbery, Woodward being actually robbed but apparently a

hurried getaway in the case of Pitts prevented accomplishment of that purpose. Shepard also was robbed and the shooting in his case was practically identical in detail with the other crimes, except that he was fortunate that his wound did not result in death. What led to defendant's arrest was that a watch which had been stolen from Shepard was discovered in a pawnshop in Cleveland and found to have been pawned there by defendant. The weapon with which all the shootings had been performed was identified as belonging to defendant.

*Id.* (emphasis added).

By virtue of demonstrating a distinct signature method, identically executed as to each crime, the evidence in *Wable* was properly admitted. It established a connection between the bad acts and the crime on trial such that "proof of one will naturally tend to show that the accused is the person who committed the crime on trial." *Id.*; *see Shaffner*, 72 Pa. at 65 (indicating that "a connection which shows that he who committed the one must have done the other" is admissible to show identity). Although the bad acts in *Wable* did not necessarily establish that the defendant had conceived an overarching plan of which the attack on each truck driver was an integral part, or that one was committed for the purpose of the other, this Court indicated that because of the striking similarities between the bad acts and the crime charged, the bad acts were probative of a common scheme. *Wable*, 114 A.2d at 337. This erroneous (and perhaps inadvertent) conflation of the signature requirement with the requirement for proving common scheme opened the door to a decades-long misunderstanding about what type of connection is truly required for the purpose of proving a common scheme.

Indeed, many of our cases since *Wable* have, like *Wable*, properly allowed bad acts showing signature-like "striking similarities" to the charged crime while improperly characterizing identity evidence as admissible for the purpose of proving a common scheme. *See, e.g., Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1318 (1995) (positing, incorrectly, that bad acts evincing a true signature are "relevant and admissi-

ble for the purpose of establishing a common scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one naturally tends to prove the others"); *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335, 1340 (1995) (equating, incorrectly, the "common scheme" exception and the " 'signature crime' exception"); *Commonwealth v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1283 (1989) (admitting evidence of strikingly similar bad acts for the purpose of showing identity **and** common scheme, despite absence of an overarching plan). Contrary to the conflation of the requirements shown in these cases, invocation of the common scheme exception should be limited to circumstances from which a true plan or motive can be inferred. Striking similarities, on the other hand, may be admissible to show identity, intent or lack of accident, which may also be shown by evidence of a common scheme.

In contrast to the bad act evidence in *Wable* that clearly earmarked those crimes as the "handiwork" of the accused, the bad act evidence in *Commonwealth v. Bryant*, 531 Pa. 147, 611 A.2d 703 (1992) (*"Bryant II"*), merely showed general similarities, insufficient to establish the identity of the perpetrator, or any other permissible purpose. In *Bryant II*, the defendant was on trial for the murder of an elderly woman named Edith Steckle, who had been found lying on the ground floor of her home, "brutally and viciously injured in the face, head, body, arms and legs." *Id.* at 706. The trial court admitted bad act testimony about a subsequent attack for which the defendant had been convicted. *Id.* We vacated the defendant's judgment of sentence and remanded the case for a new trial because we could not conclude that there was anything "unusual" or "distinctive" connecting the two crimes so as to prove "that both ... were perpetrated by the same individual." *Id.*

Both crimes occurred at approximately the same time of night and within a one and one-half block of the Appellant's home. However, the victims' ages varied drastically, in addition to the victims being of different races. Furthermore, the evidence was questionable as to whether Mrs.

> Steckle was sexually assaulted although Ms. Phillips was assaulted. It was also widely known that Mrs. Steckle lived alone while Ms. Phillips lived with her three-year-old son. Furthermore, [unlike Mrs. Steckle,] Ms. Phillips was punched only in the head. [Unlike Mrs. Steckle], Ms. Phillips was dragged to the second-floor bedroom. Finally, a television, radio, and ring were taken from Mrs. Steckle's home, while only thirty dollars in cash was taken from Ms. Phillips even though a portable television and radio were in full sight of the burglar.

*Id.*

We confirmed in *Bryant II* that where the similarities between the crimes lack "any uniqueness" and where differences between them abound, we will "be hard pressed to conclude that the same individual committed both crimes." *Id.*; *see also, e.g., Commonwealth v. Patterson*, 484 Pa. 374, 399 A.2d 123, 127 (1979) (finding that bad act evidence did not establish "identical method" where charged crime involved attacker who wielded an ice pick, wore light-tinted sunglasses, and raped his victim in a garage while bad act involved attacker who carried a gun, wore dark sunglasses, and raped his victim in an apartment, despite both rapes occurring in same area, late at night, and commencing in alleyways); *Commonwealth v. Fortune*, 464 Pa. 367, 346 A.2d 783, 787 (1975) (where victims were different ages and weapons were not identical, "too many details … are unexplained or incongruous to say that one crime naturally tends to show that the accused is the person who committed the other").

This analysis of our case law is consistent with commentators who are generally critical of courts admitting 404(b) evidence based on mere similarities, as opposed to either a true signature or a true plan. *See* 1 Imwinkelried, *Uncharged Misconduct Evidence*, § 3:24 (2005) (collecting authorities); *see also* McCormick, Evidence, § 190 (2013 7th ed.). According to Imwinkelried, proof of a number of similar bad acts

> may be probative of the defendant's status as a professional criminal; and the similarities may tend to show that when faced with similar, random opportunities for committing a

crime, the defendant repeatedly chooses to use roughly the same methodology. However, **if the similarities are insufficient to establish modus [i.e., signature] and there is no inference of a true plan in the defendant's mind, the proponent is offering ... forbidden ... character, disposition, or propensity evidence.**

1 Imwinkelried, *Uncharged Misconduct Evidence*, § 3:24 (2005) (emphasis added). Specifically, Imwinkelried admonishes the use of "common scheme" as a justification to admit unlinked acts on the theory that a pattern or systematic course of conduct amounts to a "plan." *Id.* Neither a "spurious plan" nor a plan to commit a series of similar crimes should be permitted as evidence that the accused committed the crime on trial. *Id.*; *see also Shaffner*, 72 Pa. at 65–66.

Signature-like similarities are as essential for proving absence of accident as they are for proving identity. *See Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 89 (2004). In *Boczkowski*, we explained that "the **remarkable similarity** between the manner in which both of appellant's wives were killed" makes evidence concerning the circumstances of one death support a reasonable inference that the other's death "was not accidental, but rather, was a result of appellant's deliberate act." *Id.* (emphasis added). There, the defendant was on trial for murdering his wife who died in a hot tub. She was in her thirties and in good health. The defendant reported to police that she had been drinking before getting in the tub and that he and his wife had argued the previous night. Her autopsy revealed she died of asphyxiation, not from drowning, as the defendant had suggested. The court admitted evidence concerning the circumstances of the defendant's former wife's death, and we found no abuse of discretion. His former wife, who died in her bathtub, was also in her thirties and in good health. At the time of his former's wife death, the defendant had reported to police that she had been drinking before getting in the tub and that they had fought the previous night. His former wife's autopsy revealed that asphyxiation was her cause of death. In each case, the defendant had fresh scratch marks on his arms, hands and torso following his wife's death.

*Id.* at 82. Given these striking similarities, the prior bad act was admissible mens rea evidence to establish the defendant's intent and to rebut his claim of an accident.

The learned Concurrence agrees with my view that bad acts evidence must evince "striking similarities" or constitute a "signature crime" to be admitted for the purpose of proving identity, i.e., that the accused is the person who committed the crime on trial. *See* Concurring Op. (Saylor, C.J.) at 472–73, 156 A.3d at 1130; *see also Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831 (2014) (Saylor, C.J., dissenting). Concluding, (as I do), that the prior acts here do not present a signature and are not "strikingly similar" to the circumstances surrounding the death of the victim in this case, the Concurrence would also find the testimony inadmissible to prove the defendant's identity.

Chief Justice Saylor, however, would admit the evidence anyway, based upon a much lower standard for admission. Concurring Op. (Saylor, C.J.) at 483–84, 156 A.3d at 1137. To show absence of accident, the Concurrence posits that "roughly similar" bad acts may be introduced on a "doctrine of chances" rationale to prove a defendant committed the actus reus[5] when the defendant asserts no actus reus occurred at all, because the victim's harm resulted instead from some innocent force. *Id.* at 475, 156 A.3d at 1132. I fail to see how the admission of "roughly similar" bad acts, for the stated purpose of proving the **act** of murder (by none other than Hicks), is any different than allowing evidence of Hicks' violent propensity toward women to serve as proof that he committed the charged crime.

The Concurrence urges that the doctrine of chances allows for the admission of similar acts (within the same general category as the charged crime) "to establish the objective improbability of so many accidents befalling the defendant or the defendant becoming innocently enmeshed in suspicious

5. Black's Law Dictionary defines actus reus as "the wrongful deed that comprises the physical result of human conduct and that generally must be coupled with mens rea to establish criminal liability; a forbidden act." As to first-degree murder, the actus reus is the act of killing. Black's Law Dictionary 39 (8th ed. 2004).

circumstances so frequently." *Id.* at 1133 (citing Edward J. Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non–Character Theory of Logical Relevance, The Doctrine of Chances*, 40 U. Rich. L. Rev. 419, 439). I strongly disagree and I am unpersuaded by the Concurrence's effort to characterize the doctrine of chances—in largely academic terms—as a "non-character" theory of logical relevance.

As a practical matter, the doctrine is, in my view, merely an excuse for admitting otherwise inadmissible propensity testimony. Especially as applied to the facts of the case before us, its application threatens to swallow the rule.[6] I oppose the notion that we should apply a less stringent ("roughly similar") standard for admitting evidence when the purported purpose is to prove the actus reus.

Even if I were to concede that the doctrine of chances rests upon a non-character rationale, which I do not, I would limit its application to a narrow set of circumstances, consistent with its theoretical underpinnings. Citing Imwinkelried, the Concurrence recognizes, but fails to apply, at least three important limitations. *See* Concurring Op. (Saylor, C.J.) at 483–84, 156 A.3d at 1136–37. First, the required degree of similarity between the bad acts and the charged crime must place them, at the very least, within "the same general category." *Id.*[7] In the instant case, the victim was, according to the

6. Notably, "several commentators have argued that prosecutors are now smuggling inadmissible bad character evidence into the record under the guise of invoking the doctrine of chances." Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 586 (1990). The doctrine's potential to eviscerate the character evidence prohibition is stronger still given the reality that limiting instructions do little to curb the jury's commonsense or perhaps unconscious mis-application of 404(b) evidence. *See* Concurring Op. (Saylor, C.J.) at 485 n.16, 156 A.3d at 1138 n.16.

7. In discussing the degree of similarity necessary to achieve a non-character application of the doctrine of chances, another commentator (cited by Imwinkelried but not by the Concurrence), explains:

The closer the physical similarities in the acts, the less likely the acts were a coincidence. For example, a pair of accused car thieves may claim to have had a good faith belief that they had permission to take an automobile. Evidence showing that they had previously stolen a

Commonwealth, severely beaten on her entire body prior to being suffocated and beheaded. *See infra*, note 11. By contrast, the 404(b) witnesses did not allege that Hicks inflicted any blunt force trauma upon them, and they certainly were not decapitated. *Id.* Moreover, as to the 404(b) witnesses, Hicks did not attempt and was never charged with any class of murder. In fact, the violence he allegedly inflicted upon the 404(b) witnesses—putting his hand or hands on their necks or throats—did not lead to any charges whatsoever against Hicks. Clearly, the bad acts admitted in this case were not in "the same general category" as the one perpetrated against the victim. *Accord Commonwealth v. Donahue*, 519 Pa. 532, 549 A.2d 121, 127 (1988) (explaining that, for the purpose of proving absence of accident through bad acts that are not "strikingly similar," the Commonwealth must show that "a similar result obtained in both cases").

In *Donahue*, the defendant was on trial for murder in which the death of the victim was caused by alleged child abuse. *Id.* We affirmed the allowance of evidence of alleged prior acts of child abuse resulting in a "pattern of bruises" over the prior victim's body because it was probative of whether **the same injuries** on the victim in the charged case were accidental, as the defendant claimed they were. *Id.* As described in detail herein, the differences between the bad acts and the charged crime in the instant matter far outnumber their similarities. Given the extreme brutality of the charged crime, it cannot be said that the same injuries or "a similar result obtained in [all] cases," making this case distinguishable from *Donahue. See id.*

A second important limitation that the Concurrence acknowledges, but fails to apply, is that the doctrine of chances

stereo would have very little inferential value in proving or disproving coincidence. However, evidence showing that defendants had made a similar 'mistake' with other cars would strongly indicate a lack of coincidence.

Eric D. Lansverk, *Admission of Evidence of Other Misconduct in Washington to Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1230–31 (1986) (internal footnote omitted).

depends upon the defendant having committed the similar bad act **many times,** indeed many more times than "the frequency rate for the general population."[8] Concurring Op. (Saylor, C.J.) at 483–84, 156 A.3d at 1136. The large number and high frequency of the prior incidents are what give the doctrine any claim, however tenuous, to embodying a non-character rationale. Absent numerosity and frequency (not to mention "striking similarities"), the proffered 404(b) evidence cannot support the necessary determination of **"objective improbability"** that the defendant would face **so many** similar accusations, yet be innocent as to this one. *Id.* at 476–77, 156 A.3d at 1132–33 (emphasis added). Thus, in my view, any application of the doctrine of chances should be limited to textbook-type cases like *United States v. Woods,* 484 F.2d 127 (4th Cir. 1973).

In *Woods,* the defendant was charged with murdering her seven-month-old foster son, Paul, by means of cyanosis (oxygen deprivation). The prosecution offered and the trial court admitted evidence of **twenty** prior instances of cyanosis occurring in a total of nine children under the defendant's care, including seven other deaths. *Woods,* 484 F.2d at 130. In all cases, the children were under the age of three. On appeal, the Fourth Circuit affirmed the trial court's admission of the prior acts to show the defendant's criminality, or absence of accident. The *Woods* court explained:

> With regard to no single child was there any legally sufficient proof that defendant had done any act which the law forbids. Only when all of the evidence concerning the nine other children and Paul is considered collectively is the conclusion impelled that the probability that some or all of

**8.** As Imwinkelried has explained, it must be clear that "the accused has suffered the loss more frequently than the typical person endures such losses accidentally." Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition,* 51 Ohio St. L.J. at 591. Accordingly, "it is highly relevant to consider the number of losses the accused has suffered" and "if the judge has no basis for determining the frequency of such accidental occurrences among the general populace" or "if the judge ... genuinely doubt[s] whether the frequency of the accused's losses exceeds the incidence for the general population[,]" the judge must exclude the evidence. *Id.* at 590.

the other deaths, cyanotic seizures, and respiratory deficiencies were accidental or attributable to natural causes was so remote, the truth must be that Paul and some or all of the other children died at the hands of the defendant. We think also that when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime.

*Woods*, 484 F.2d at 133.

Unlike here, the prior acts in *Woods* were indisputably of the same general category as the charged crime. Also unlike here, the similar incidents (cyanosis) in *Woods* had occurred at least twenty other times and led to seven other deaths. There was little doubt that, as a matter of objective probability (as opposed to subjective bad character), the defendant in *Woods* committed the criminal act of infanticide. By contrast, the three bad acts admitted in the instant case were entirely insufficient both in degree of similarity to the charged crime and in number/frequency to support anything other than an improper inference as to Hicks' character.[9]

A third limitation to the application of the doctrine of chances is that there must be some disclaimer of liability both with respect to the prior instances and the charged crime. The commentators cited by the Concurrence almost universally describe the doctrine in these terms. *See, e.g.*, Imwinkelried, *An Evidentiary Paradox*, 40 U. Rich. L. Rev. at 437 (explaining that the evidence is offered "to establish the objective improbability of **so many accidents** befalling the defendant or

---

**9.** For similar reasons, I question whether *Donahue* properly applies the doctrine of chances. In that case, a single prior incident bearing no signature-like similarities to the charged crime was nonetheless admitted to show lack of accident. The frequency requirement underpinning the doctrine was clearly absent in *Donahue* but, at least in that case (unlike here), the injuries in the charged crime and the prior incident were the same. *Id.* at 127. Moreover, *Donahue* (like *Woods*) was a child abuse case, for which other evidence is commonly unavailable. This fact may well have driven the result. *See* Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. at 586 (discussing the particular relevance of the doctrine of chances in child abuse cases where the accused often contends the victim's injuries were sustained accidentally).

the defendant becoming **innocently enmeshed** in suspicious circumstances so frequently")(emphasis added); Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape*, 29 U.C. Davis. L. Rev. 355, 411 n.225 (1996) (noting that "the doctrine focuses on the improbability of **repeated false accusations** against the same person"); *id.* at 387–88 (indicating that the prior "acts" should really be called "happenings" in the context of a doctrine of chances analysis). It is difficult (if not impossible) to determine the objective improbability that one or all of the incidents in question are accidents when they are not all claimed to be such. Accordingly, this third limitation, like the first two, affords theoretical integrity to the doctrine. In the instant matter, there was no contention at the time the prior acts occurred, or otherwise, that they somehow occurred by accident. The present scenario simply does not lend itself to application of the doctrine of chances.

The Majority does not dispose of the present matter with any specific "absence of accident" analysis. Instead, with respect to the existence of a common scheme or signature, the Majority relies heavily on this Court's recent Rule 404(b) decision in *Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831 (2014). *Arrington*, in my view, is the unfortunate culmination of the conflation of the requirements to establish a signature crime with those necessary to establish a common scheme or plan, which conflation had its genesis in *Wable. See supra*, p. 498, 156 A.3d at 1146. It falls squarely within the admonition articulated herein that where the similarities are insufficient to establish a signature crime, and there is no true plan, the evidence shows only the defendant's propensity and must be prohibited. *See supra*, p. 501, 156 A.3d at 1147–48.

In *Arrington*, the defendant stood trial for first-degree murder in the shooting death of his ex-girlfriend, Tondra Dennis, who had him arrested following years of physical and emotional abuse, including beatings, death threats and break-ins. Ten days after Arrington's release from custody, an unidentified man shot Dennis on the street near a home Arrington had once shared with his mother. *Arrington*, 86

A.3d at 839. The trial court admitted evidence that Arrington had physically assaulted and harassed three other girlfriends, characterizing the abuse in each relationship as triggered by the woman attempting to break up with him or interacting with other men. *Id.* at 842.

One former girlfriend testified that Arrington had followed and telephoned her incessantly, threatened to harm her brother, set fire to her apartment, slashed furniture, threw her belongings off a terrace, and inflicted two beatings upon her and two attacks upon her brother. *Id.* at 843. A second ex-girlfriend testified that Arrington had physically assaulted her three times over the course of their two-year relationship, including a punch to the face, and two separate pistol-whippings to her jaw and head, respectively. *Id.* The jury heard additional testimony that Arrington had struck this woman's male friend on the shoulder with an axe and fired a gun at her friend's brother. *Id.* The third ex-girlfriend testified that Arrington had punched her in the face, continually harassed and followed her, and threatened to kill her and her family when she ended their relationship. *Id.* at 843–44.

A Majority of this Court held that the "shared characteristics of each relationship"—monitoring his girlfriend's daily activities; resorting to violence when his partner wanted to end a relationship or interacted with other men; inflicting head or neck injuries with his fist, a handgun or an edged weapon; and harming or threatening to harm members of his girlfriend's family—rendered the evidence admissible under Rule 404(b)(2). *Id.* at 844. Notably, the *Arrington* Majority did not purport to find a "signature method" or "striking similarities," departing even from our *Wable* line of cases. *See supra*, pp. 498–99, 156 A.3d at 1146–47. Indeed, these crucial terms appear nowhere in the opinion, and for good reason; there was clearly nothing signature-like to connect Arrington's disparate violent acts. They were not carried out in an identical fashion, as the *Arrington* Majority ostensibly conceded by listing the five distinct methods Arrington employed to inflict

injury on his partners or their male friends. *See Arrington*, 86 A.3d at 844.

Instead, we explained that "in order for evidence of other criminal activity to be admissible to establish a common scheme ... 'a comparison of the crimes must establish a logical connection between them.'" *Id.* at 842 (quoting *Commonwealth v. Miller*, 541 Pa. 531, 664 A.2d 1310, 1318 (1995)). The *Arrington* Majority then concluded that Arrington's "repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly weapon" amounted to a "common plan or scheme." *Id.* at 844. Thus, in *Arrington*, we ultimately held that similar, repeated, but entirely unconnected acts, constituting, at most, a pattern of abusive behavior toward women, establish the kind of logical connection necessary for the purpose of showing a common scheme to establish identity.[10] *See id.* As my historical overview of our jurisprudence makes clear, they do not. The other bad acts in *Arrington* were clearly not part of the defendant's purpose in committing the crime charged. Thus, the holding in *Arrington* lacks precedential support and, under a very thin veil, permits evidence of the violent propensity of a defendant to prove the crime charged. For the same reasons I dissent in the present matter, I would overrule our decision in *Arrington* as it is a departure from our cornerstone jurisprudential requirements for establishing a common scheme or plan and evinces nothing close to the required signature for purposes of showing identity. *See Arrington*, 86 A.3d at 860–61 (Saylor, C.J., dissenting) (cautioning that "as the decisional law gravitates further and further away from the centering ground of signature crimes, the identity/propensity distinction devolves to a matter of semantics").

Turning to the case at bar, if there is anything "unusual and distinctive" about the circumstances surrounding the victim's death, it is the fact that she was brutally beaten, strangled,

10. As noted, the *Arrington* Court did not rely on the bad acts evidence to support a "lack of accident" exception. Even if it had, *Arrington*'s conclusion that the shared characteristics of the prior abusive relationships sufficed to establish a logical connection between them and the crime charged is a monumental leap from the standard articulated in *Donahue* (a child abuse case) that required a similarity in the bad act and outcomes to establish lack of accident.

decapitated and dismembered with a saw blade; her body parts were then strewn in garbage bags along two highways; and her hands were found buried in the wall of Hicks' bedroom closet, wrapped in athletic socks, newspaper, layers of detergent and plastic bags. *See* N.T., 11/5/2015, at 91–93; N.T., 11/6/2014, at 28–90; N.T., 11/7/2014, at 162–68. Had the Commonwealth sought to introduce evidence that Hicks had previously attacked a number of women in a manner demonstrating an "uncanny similarity in all the details" surrounding the victim's death, there would be little question as to its admissibility. *See Wable*, 114 A.2d at 337. Instead, the bad acts admitted here merely share some generic characteristics with each other and, to a lesser degree, with the violent acts perpetrated against the victim. There are simply no "striking" or "remarkable" similarities. *See id.* at 336; *see also Boczkowski*, 846 A.2d at 89. Moreover, there is nothing "distinctive" about the bad acts that would set them apart from other "crimes of the same class." *See Bryant I*, 530 A.2d at 86 (citing McCormick, <u>Evidence</u>, § 190 (1972 2d ed.)). Indeed, the bad acts relied on here are not even "of the same class" as the charged crime.[11] *See id.*

11. Although the Commonwealth's forensic expert, Dr. Ross, testified that the victim was alive when she was beaten, strangled, and decapitated, and that her cause of death was a combination of strangulation and sharp force injury to the neck, N.T., 11/6/2014, at 59–90, Hicks' expert, Dr. Shane, testified that the victim's bruising and lacerations occurred after her death, and that her cause of death was most likely related to substance abuse. N.T., 11/12/2014, at 15–38. Notably, Dr. Shane testified that "there was nothing to indicate that [the victim] was strangled" or that there was "any intervention while she was still alive." *Id.* at 27. He further testified that there were no compression injuries, no fingernail injuries, and no other signs of "forceful strangulation" or "manual strangulation" on the victim's body. *Id.* at 28. He also testified that the bite marks on the victim's tongue were consistent with a drug overdose, countering Dr. Ross' conclusion that they resulted from strangulation. *Id.* at 38. Another of Hicks' experts, Dr. Mihalakis, concurred with Dr. Shane that there was no evidence of strangulation or choking on the victim's body. *See id.* at 78–79. He testified, "I did not see any fingernail markings in the neck. I didn't see any ligature marks, and I didn't see any scratching in the neck." *Id.* at 79. Moreover, both Dr. Shane and Dr. Mihalakis testified that immunohistochemistry, the method of forensic analysis used by Dr. Ross, is typically used on live tissue, and considered unnecessary or unreliable when used on decomposed tissue like that of the victim. *See id.* at 27, 67.

The absence of a signature is particularly apparent from the extraordinarily broad categories the Majority creates in its strained effort to elucidate the required "striking similarities." *See* Majority Op. at 453–54, 156 A.3d at 1127. The Majority indicates that, in each case, Hicks "(1) was introduced to drug-dependent women of similar body types for purposes of using drugs" and "(2) showed a sexual interest in the women, sometimes involving prostitution." *Id.* The fact that Hicks allegedly attacked women is hardly a distinctive feature. It merely narrows his victims to approximately half the population. That these women were drug dependent and encountered Hicks in the context of drug-use and, sometimes, prostitution, is also unremarkable, especially given that Hicks was himself drug addicted. Moreover, I find no support in the record for the Majority's statement that all of the women had similar body types.[12]

In his Concurrence, Justice Baer draws an ex post facto conclusion that there was no controversy as to the cause of death. *See* Concurring Op. (Baer, J.) at 491–92, 156 A.3d at 1142. While I recognize that Dr. Shane's testimony may be viewed as ambiguous, it nonetheless raised the question whether the victim could have died from an overdose. The defendant had no burden to prove, unequivocally, that the victim's death resulted from an accident. He only had to raise a reasonable doubt as to the Commonwealth's cause of death theory. Contrary to Justice Baer's assertion, ambiguous testimony is not tantamount to uncontradicted testimony. *See id.* Moreover, in charging the jury, the trial court correctly presented the jury's role in considering contradictory expert evidence: "In this case, the testimony and opinions of Dr. Ross, Dr. Shane, and Dr. Mihalakis may seem to conflict with each other in certain aspects. If you find that the conflict is more than superficial, that the conflict is real and irreconcilable, you may decide what parts, if any, of the contradictory testimony and opinions you choose to believe." N.T., 11/14/2014, at 109.

Even setting aside any violence inflicted to the victim's neck, none of the bad acts come close to resembling the savage treatment of the victim's body at issue in this case. Unlike the victim, none of the 404(b) witnesses suffered blunt force trauma, let alone an estimated seventeen impacts to the head and face inflicted by a hand, fist or foot said to have been suffered by the victim. *See* N.T., 11/6/2014, at 27–45. Unlike the victim, none of the 404(b) witnesses suffered injuries to their torsos, let alone multiple fractures to each of their ribs by stomping or kicking. *Id.* at 46–54. And, unlike the victim, none of the 404(b) witnesses suffered a laceration to the back of her head, likely inflicted by a crowbar, pipe or claw end of a hammer. *Id.* at 35–42.

12. The victim was a white woman, approximately 5' 7" tall, 150–160 pounds with long black hair. Commonwealth's Exhibit 35 (Autopsy

The Majority next posits that, in each case, Hicks "(3) resorted to violence when the women behaved in a way he found disagreeable; (4) inflicted injuries on each woman by targeting her neck area with his hands, a sharp edged object, or both; and (5) verbally threatened to kill each woman." *Id.* Regrettably, these are descriptions that could easily be applied to the vast majority of violent crimes, maybe even more so to crimes of violence that arise between drug-addicted sexual partners. Even putting drugs and sex aside, one might safely assume that a substantial majority of violent interactions in this world occur as the result of one person finding another person's behavior "disagreeable." Moreover, as a factual matter, the record offers no evidence that the victim behaved in a way Hicks found disagreeable prior to her death or that he verbally threatened to kill her.

The differences between the attacks in this case are far more pronounced than the similarities, making this case much more like *Bryant II*, *Patterson* and *Fortune* than *Wable* or *Boczkowski*. Hicks allegedly choked Ms. Alston, causing her to lose consciousness. He threatened her with a gun (his) and a pocket knife (hers), and raped her during the assault. He also threw a glass table at her. She was not a prostitute and was not trading sex for drugs. To the contrary, she was providing drugs to Hicks, who was apparently upset that she was not

Report). At the time she was murdered, she was approximately 36 years old. The record reveals that Ms. Alston is a black woman and was approximately 41 years old when the alleged incident with Hicks occurred. Commonwealth's Offers of Proof, 4/27/2011, at Exhibit C (Alston Police Report). Ms. Chavez is a white woman and was approximately 24 years old at the time Hicks allegedly attacked her. *Id.* at Exhibit B (Chavez Police Report). Ms. Washington is a black woman who was approximately 31 years old at the time of her encounter with Hicks. *Id.* at Exhibit E (Washington Police Report). I have discovered no evidence in the record indicating the respective heights, weights or other descriptors of the body types of the 404(b) witnesses. The Majority cites to the trial court's 1925(a) opinion which, notably, does not cite to anything when it finds that "the victims [sic] and the three witnesses were all of a similar body type." *See* Majority Op. at 460, 467–68, 156 A.3d at 1123, 1127 (citing Trial Court Opinion, 8/18/2015, at 31). To the extent the trial court was relying on its own observations as to the witnesses' body types, I would observe that many years had elapsed between the prior bad act incidents and the trial, and there would be no

more freely sharing her supply. The incident occurred in Hicks' Hampton, Virginia home on the first and only occasion the two met, in 2006. *See* N.T., 11/6/2014, at 184–200.

Unlike Ms. Alston, Ms. Washington was a prostitute. She allegedly did drugs with Hicks on the occasion of the alleged attack, which occurred during their first and only encounter, in Fort Worth, Texas in 2003. Unlike the incident with Ms. Alston, Hicks did not threaten Ms. Washington with a gun or a knife, but with his car. Rather than grabbing her throat while in his home, he grabbed the back of her neck while in a car. She never lost consciousness. In fact, following the alleged assault, she was able to drive the car, which Hicks allowed her to do. He told her that he wanted someone to love him, but he did not attempt to penetrate her during the assault. He did not throw a glass table (or anything else) when she tried to leave. Although he allegedly threatened to run her over with his car if she got out, he did not follow through on this threat. *See* N.T., 11/7/2014, at 60–86.

Ms. Chavez was a prostitute at the time Hicks allegedly attacked her. She had been seeing him a couple times a week (or every couple of weeks) for three to five months. She testified that their encounters always involved her using drugs but did not always involve sex. Hicks was reportedly clean and sober at the time he attacked her, unlike his state when he allegedly attacked the other two witnesses. He allegedly grabbed Ms. Chavez's neck with both hands while they were driving in Hicks' truck together. She testified that she felt like she was blacking out but did not say that she became unconscious. Hicks threatened to kill Ms. Chavez when she opened the car door but he ultimately pulled off the road and calmed down. He did not throw anything at her or use an edged weapon. He apologized for hurting her and he brought her to his house to clean blood from her neck caused by his finger-nails. Their encounter occurred in Arlington, Texas in 2002–2003. *See* N.T., 11/7/2014, at 86–106.

To the extent there are similarities between the bad acts and the charged crime, they are entirely insufficient to show a true signature for purposes of proving identity, intent or lack

way for the trial court to know that the witnesses' body types had not changed during that time.

of accident. The infrequency of the prior acts, which do not fall in the same general category as the charged crime, also weighs heavily against their admission for the latter purpose, even if we applied some diluted version of the doctrine of chances. Moreover, the required connection from which a true common scheme or motive might be inferred is absent. The admitted testimony is indicative of nothing more than a pattern of violent behavior. There is no evidence from which to draw an inference that Hicks conceived of an overarching plan encompassing any of the bad acts and the charged crime, or that he committed any of the bad acts as "part of his purpose" to murder the victim. *See Shaffner*, 72 Pa. at 65–66. Neither the Commonwealth nor the Majority claim otherwise. By the Commonwealth's own admission, there was no plan at all, as Hicks' violent behavior was merely a spontaneous reaction to a speculated disagreement. Rather, it advances a definition of "common scheme" that requires no scheme at all but instead justifies the admission of random, unlinked acts so long as it is possible to discern some similarity with the charged crime, no matter how attenuated or unintentional.

If Rule 404(b) is to accomplish its intended purpose, it must be strictly construed in light of the common law principles underlying it, as articulated by this Court more than a century ago. *See Shaffner*, 72 Pa. at 65–66. Instead, the bad acts testimony allowed here was used to establish precisely what Rule 404(b) prohibits, i.e., that because Hicks had acted violently toward three women in the past, he was therefore capable of, and would have a propensity to commit, the far more extensive, brutal and ultimately fatal acts of violence perpetrated on the victim in this case, several years later. By permitting such an inference to be drawn, the Majority all but eliminates Hicks' presumption of innocence and the Commonwealth's burden to prove, in this case, that Hicks is guilty of first-degree murder. *See Commonwealth v. Stanley*, 484 Pa. 2, 398 A.2d 631, 633 (1979).

Finally, the admission of bad act evidence completely lacking in the necessary connection to the charged crime is not harmless error. *See Fortune*, 346 A.2d at 787 (remanding for a

new trial because "whenever a jury improperly receives evidence of other crimes, the impact is significant"). Our standard for determining harmless error is clear. If an appellate court "concludes beyond a reasonable doubt that the error could not have contributed to the verdict," the error is harmless. *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202, 214 (2003) (citing *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 164 (1978)). However, "if there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless." *Id.* The Commonwealth bears the burden of establishing harmlessness beyond a reasonable doubt. *Id.* Specifically, we will find harmless error where:

(1) the error did not prejudice the defendant or the prejudice was de minimis;

(2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or

(3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166, 193 (1999).

In the instant matter, the Commonwealth itself has repeatedly and unambiguously argued that its case against Hicks was largely circumstantial and that it viewed the bad acts testimony as essential to proving the elements of first-degree murder beyond a reasonable doubt. *See* Commonwealth's Brief at 12–14 (arguing the "fact that the case was circumstantial in its evidence coupled with the defense of accident being the suggested manner in which the victim died, all warrant the conclusion that the Commonwealth's need for the [404(b)] evidence was, in fact, great"); *see also* Offer of Proof, 4/27/2011, ¶ 15 (arguing that "the need for other crimes evidence is high in that the case against [Hicks] is primarily based on circumstantial evidence and [Hicks] has already placed an [sic] issue the precise cause and manner of the victim's death"); *see also* Statement Pursuant to Pa.R.A.P. 1925(b), 8/8/2011 (explaining that "the proof of murder in this

case is entirely circumstantial" and "[t]he [404(b) ] evidence would allow the jury to conclude that the victim's death was the result of defendant's assault").

There were no witnesses to the crime and Hicks did not confess to the murder. *See* Commonwealth Brief at 12–13. As described hereinabove, whether strangulation and decapitation played a role in the victim's death was very much in question. *See supra*, note 11. The 404(b) evidence permitted the jury to draw the improper inference that because Hicks had allegedly inflicted injury to the throat or neck of the 404(b) witnesses, he must also have strangled the victim and beheaded her. In fact, the trial court stated in its opinion ruling on post-sentence motions that the 404(b) evidence helped "elucidate that it was [Hicks] who killed the victim," as opposed to another. *See* Trial Court Opinion, 8/18/2015, at 16. As we said in *Young*, "[i]t is difficult to imagine any evidence more prejudicial to a defendant than that which identifies [him] as a perpetrator of a capital crime." *Young*, 748 A.2d at 193. Accordingly, there is no question that the testimony of Ms. Alston, Ms. Washington and Ms. Chavez significantly prejudiced Hicks.

For these same reasons, it is impossible to conclude that the 404(b) evidence "was merely cumulative of other untainted evidence." *See id.* By the Commonwealth's own admission, absent the 404(b) testimony, it lacked sufficient evidence to prove that Hicks caused the victim's death beyond a reasonable doubt. Moreover, the "uncontradicted evidence" did not overwhelmingly point to Hicks committing the murder, as opposed to merely committing the crime of abuse of corpse following the victim's death by drug overdose. *See supra*, note 11. Even the most damning of the uncontradicted evidence— that the victim's hands were found buried in Hicks' wall—is consistent with Hicks' guilt of abuse of corpse and innocence as to the murder itself. Because the bad acts evidence was wrongly admitted and because its admission was far from harmless, I would reverse the judgment of sentence and remand this case for a new trial.

JUSTICE WECHT, Dissenting

Rule 404 of the Pennsylvania Rules of Evidence generally bars the use of prior bad acts evidence to prove that a person acted in accordance with his previous conduct. See Pa.R.E. 404. The party seeking admission of the evidence cannot use those acts or behaviors to convey to the jury that the opposing party must have done "X" because he has done "X" before, or many times before. Justice Donohue cogently describes the prejudicial impact of admitting such evidence, and the manner in which it diminishes the Commonwealth's obligation to satisfy its constitutional burden of proof beyond a reasonable doubt. See Diss. Op. at 492, 156 A.3d at 1142–43 (citing Shaffner v. Commonwealth, 72 Pa. 60, 65 (1872)).

Rule 404 is challenging, and the consequences of its erroneous application are significant. Basic human nature and rational thought tend to default toward the very logic that the rule prohibits. It is natural and well-nigh inevitable that a juror considers a person to be a drug dealer when told that the same person has dealt drugs multiple times in the past, or that a juror will conclude that, if a person has assaulted women before, he likely will do so again. Although we presume that jurors follow a trial judge's instructions, see Commonwealth v. Chmiel, 612 Pa. 333, 30 A.3d 1111, 1184 (2011), it is difficult to set aside opinions that arise naturally and to confine evidence of an inflammatory nature to a purpose whose limitations conflict with intuitive thought processes. I have no doubt that jurors across this Commonwealth are capable of rising to this challenge, and that they do so on a daily basis in our courtrooms. This does not, however, obviate the fact that putting aside such innate reactions is a daunting task for any person.

Moreover, Rule 404's exceptions are both numerous and broad. See Pa.R.E. 404(b)(2). This creates the obvious danger that the exceptions will devour the rule. If courts do not adhere scrupulously to the terms and purposes of the rule, this danger becomes reality.

These concerns, as well as those highlighted by Justice Donohue, illuminate the problems that can taint otherwise fair

trials when Rule 404 is incorrectly applied. Moreover, they underscore the requirement that prior bad acts evidence must be strictly limited and admitted only when passed through the rigorous inquiry articulated skillfully by Justice Donohue. The contested evidence in this case does not satisfy that inquiry. For that reason, and in light of my concerns set forth above, I respectfully dissent from the learned Majority's holding that the prior bad acts evidence was admissible. I join in the merits portion of Justice Donohue's dissenting opinion.

I also agree with Justice Donohue that Hicks is entitled to a new trial, albeit on slightly different grounds. Unlike Justice Donohue, I believe that the trial evidence would have sufficed to render the trial court's error harmless. The discovery of the victim's severed hands in Hicks' walls was particularly compelling. Oddly enough, the Commonwealth affirmatively has chosen to concede and forego this argument. Throughout this case, including at oral argument before this Court, the Commonwealth has insisted that the prior bad acts evidence was essential to proving Hicks guilty of the murder. See Diss. Op. at 509–10, 156 A.3d at 1152–53 (setting forth each instance in which the Commonwealth asserted the essentiality of the evidence). From the outset of this appeal, the Commonwealth has elected to concede that, if this Court deemed the admission of the evidence erroneous, such error would not be harmless, inasmuch as the Commonwealth viewed the evidence as necessary to prove Hicks' guilt beyond a reasonable doubt.[1]

---

1. In this case, the Commonwealth has never invoked the harmless error doctrine. Ordinarily, this might raise the question of whether the Commonwealth must invoke the doctrine before we may apply it. Generally, I adhere to our precedential declaration that "this Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties." Commonwealth v. Allshouse, 614 Pa. 229, 36 A.3d 163, 182 (2012). However, there is apparent tension between that principle and the well-settled rule that the "Commonwealth bears the burden of demonstrating harmless error." Commonwealth v. Chmiel, 585 Pa. 547, 889 A.2d 501, 521 (2005). Although I believe that we can apply the doctrine without prior invocation, it seems inconsistent to assign to a party a burden of proof that is applicable only in appellate proceedings, while determining simultaneously that the party has satisfied that burden without the party raising or addressing the doctrine in any way. Nonetheless, in light of the Commonwealth's unequivocal abandonment of the harmless error

I confess my surprise at the Commonwealth's position, because the discovery of the victim's hands buried in Hicks' wall seems uniquely powerful evidence in and of itself. Other parts of the victim's dismembered body were found within close proximity to Hicks' residence. The police found blood on Hicks' boots and on the passenger seat of his vehicle. The victim's DNA was located on a scrub brush found in Hicks' home. Moreover, fingerprints were recovered from garbage bags that also were found in his home. The prints belonged to Hicks and the bags matched those that were used to dispose of the victim's severed body parts. If there was not a mountain of evidence, there was a formidable hill. Although this evidence appears compelling,[2] the Commonwealth captains its own ship. And it has consistently if inscrutably maintained that this evidence was not enough to convict Hicks without admission of the prior bad acts.

I would hold the Commonwealth to its litigation position, as I believe courts should accept and enforce party admissions or concessions when reasonable.[3] It is particularly important to do so in a situation such as this, because the Commonwealth investigated, charged, and prosecuted Hicks. Having prepared and undertaken the trial of this case, the Commonwealth undoubtedly has a knowledge and understanding of its many nuances far more intimate than I ever could obtain from my cold and detached review of the paper record.

Because the Commonwealth has conceded the harmless error inquiry, I would remand the case for a new trial. Because the Majority holds otherwise, I respectfully dissent.

claim here, any tension between these principles can (and should) be resolved in another case.

**2.** There was still more. For example, one forensic pathologist, Dr. Ross, opined that numerous, violent injuries were inflicted upon the victim before her death, including at least seventeen different impacts to her head and neck. Dr. Ross also determined that the victim was strangled while still alive. These injuries were particularly relevant because Hicks was the last person to be seen with the victim while she was alive.

**3.** See generally Commonwealth v. Busanet, 618 Pa. 1, 54 A.3d 35, 59 (2012) (rejecting ineffective assistance of counsel claim, in part, because of the appellant's concession of a relevant legal point).